## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ILYASAH SHABAZZ, as Administrator of THE ESTATE OF MALIK EL-SHABAZZ, also known as Malcolm X, and, in their individual capacities, ILYASAH SHABAZZ, GAMILAH-LAMUMBA SHABAZZ, MALAAK SHABAZZ, <br><br>        Plaintiffs, <br><br>   v. <br><br> THE UNITED STATES OF AMERICA, The Estate of CLYDE ANDERSON TOLSON, on behalf of J. EDGAR HOOVER and The Estate of WILLIAM C. SULLIVAN, The Estate of GEORGE C. MOORE, The Estate of RICHARD MCGARRAH HELMS, ARTHUR FULTON, The Estate of DALE SUTTON, The Estate of AUGUST MICEK, STEVEN EDWARDS, JOHN ALI SIMMONS, RONALD TIMBERLAKE, ABDUL BASIT NAEEM, THE CITY OF NEW YORK, a Municipal Corporation, The Estate of VINCENT LYONS BRODERICK, The Estate of HOWARD R. LEARY, The Estate of FERDINAND CAVALLARO, The Estate of FRANCIS CILENTO, The Estate of WILLIAM E. CONFREY, The Estate of JOHN J. CONROY, The Estate of THOMAS T. CUSMANO, The Estate of WINSTON W. DE VERGEE, The Estate of SANFORD GARELIK, JOSEPH IACOVELLI, The Estate of JOHN J. KEELEY, The Estate of THOMAS C. RENAGHAN, The Estate of FRANCIS J.M. ROBB, The Estate of JAMES RUSHIN, The Estate of HOWARD G. SCHAETZLE, FRANCIS M. SULLIVAN, WARREN TAYLOR, The Estate of PATRICK J. TWOMEY, ERNEST VOHS, MICHAEL WILLIS, The Estate of ANTHONY ("TONY") BOUZA, The Estate of GERRY FULCHER, WILLIAM ("BILL") KNAPP, The Estate of BERNARD ("BARNEY") F. MULLIGAN, The Estate of EUGENE ("GENE") A. ROBERTS, HENRY SUAREZ, The Estate of THEODORE ("TED") THEOLOGES, The Estate of RAYMOND A. WOOD, The Estate of ANTHONY ("TONY") ULASEWICZ, and DOES 1 through 50, Inclusive, <br><br>        Defendants. | Civil Action No. <br><br> COMPLAINT <br><br> **DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 5

NATURE OF THE ACTION ...................................................................................... 7

JURISDICTION AND VENUE .................................................................................. 7

NOTICE OF CLAIM ................................................................................................. 8

THE PARTIES .......................................................................................................... 10

    PLAINTIFFS ........................................................................................................ 10

    DEFENDANTS ..................................................................................................... 10

    FEDERAL DEFENDANTS .................................................................................... 12

    DEFENDANT CITY OF NEW YORK ..................................................................... 15

    FORMER NYPD COMMISSIONER DEFENDANTS .............................................. 16

    NYPD BOSSI DEFENDANTS ............................................................................ 16

    NYPD INVESTIGATORS, DETECTIVES AND SUPERVISORS DEFENDANTS ...... 19

    JOHN DOE DEFENDANTS .................................................................................. 21

    NAMED CO-CONSPIRATORS WITHIN THE NOI ................................................ 22

STATEMENT OF FACTS ........................................................................................ 23

    MALCOLM X, THE 1960S, AND THE ASSAULT ON THE BLACK LIBERATION MOVEMENT.23

    MALCOLM X'S EARLY LIFE ............................................................................. 23

    THE NATION OF ISLAM AND ISLAM ................................................................ 24

    MALCOLM X - A POWERFUL AND INSPIRING BLACK LEADER ....................... 25

    J. EDGAR HOOVER ........................................................................................... 26

        *The Bureau of Investigation* ....................................................................... 26

*The FBI and COINTELPRO* ................................................... 27

THE NYPD AND BUREAU OF SPECIAL SERVICES AND INVESTIGATIONS ("BOSSI")...... 30

THE FBI TARGETS MALCOLM X ................................................. 32

THE DEFENDANTS KNEW MALCOLM X WAS IN IMMINENT DANGER AND MARKED FOR DEATH ................................................... 35

THE ASSASSINATION IS IMMINENT AND THE DEFENDANTS KNEW IT ............................ 40

THE CITY OF NEW YORK DEFENDANTS AND THE FEDERAL DEFENDANTS KNEW OF KNOWINGLY FACILITATED THE ASSASSINATION OF MALCOLM X ............................ 41

THE ASSASSINATION OF MALCOLM X .......................................... 42

THE COVER-UP AND DENIAL OF ACCESS TO THE COURTS.............................. 47

WITNESSES MANIPULATED BY THE NYPD DEFENDANTS .............................. 49

IDENTIFIED UNDERCOVER AGENTS, INFORMANTS, AND INFORMANT-PROVOCATEURS.. 53

*Defendant Eugene Roberts* ................................................... 53

*Defendant John Ali* ................................................... 56

*Defendant Raymond A. Wood* ................................................... 57

*Defendant Abdul Basit Naeem* ................................................... 59

SUBSEQUENT REVELATIONS IN 1977-1978 ................................................... 60

NOVEMBER 18, 2021 REVELATIONS ................................................... 61

ADDITIONAL NEW REVELATIONS ................................................... 65

*The Revelations of Walter Bowe* ................................................... 65

*The Revelations of Khaleel Sayyed* ................................................... 66

*The Revelations of Mustafa Hassan* ................................................... 67

*The Death of Leon Ameer* ................................................... 67

THE SYSTEMIC CORRUPTION OF THE NYPD AND BOSSI ................................................ 68

*The Knapp Commission* ..................................................................................... 68

CAUSES OF ACTION ................................................................................................. 70

FIRST CAUSE OF ACTION ......................................................................................... 70

SECOND CAUSE OF ACTION ..................................................................................... 71

THIRD CAUSE OF ACTION ........................................................................................ 72

FOURTH CAUSE OF ACTION ..................................................................................... 73

FIFTH CAUSE OF ACTION ......................................................................................... 73

SIXTH CAUSE OF ACTION ........................................................................................ 78

SEVENTH CAUSE OF ACTION ................................................................................... 80

EIGHTH CAUSE OF ACTION ...................................................................................... 80

NINTH CAUSE OF ACTION ........................................................................................ 82

DAMAGES ............................................................................................................... 83

JURY DEMAND ........................................................................................................ 84

PRAYER FOR RELIEF ................................................................................................ 84

The Estate of Malik El-Shabazz a/k/a Malcolm X, by its Administrator Ilyasah Shabazz and Plaintiffs Ilyasah Shabazz, Gamilah Lamumba Shabazz, and Malaak Shabazz ("Shabazz Plaintiffs" or "Plaintiffs"), by and through their attorneys, Ben Crump Law, PLLC, The Law Firm of Hunt, Hamlin & Ridley, the People's Law Office, and Beldock Levine & Hoffman LLP, for their Complaint against the above-named Defendants, allege as follows:

## INTRODUCTION

1.      Malik El-Shabazz a/k/a Malcolm X a/k/a Malcolm X Little a/k/a Malcolm X Al Hajj a/k/a Malik Shabazz ("Malcolm X" or "Plaintiffs' Decedent") was murdered on February 21, 1965. He was one of the greatest Black liberation leaders and public intellectuals of his generation. Malcolm X was a respected minister, teacher, human rights activist, and the founding member of the Organization of Afro-American Unity ("OAAU") and Muslim Mosque, Inc. ("MMI"). He fought against racism, colonialism, and oppression, and advocated for Black people to engage in self-determination.

2.      This case is about the corrupt, unlawful, and unconstitutional relationship between law enforcement, including the Defendants herein, and ruthless killers that went unchecked for many years and was actively concealed, condoned, protected, and facilitated by governmental agents, including, but not limited to, the Defendants and their agencies, ultimately leading to the orchestrated murder of Malcolm X.

3.      As a direct result of the Defendants' intentional, bad faith, willful, wanton, reckless, unreasonable and/or deliberately indifferent acts and omissions, Malcolm X was deprived of his federal constitutional rights, was robbed of his life and freedom, and sustained severe physical, emotional, and monetary damages, including conscious physical pain and suffering. As a further direct result of the Defendants' intentional, bad faith, willful, wanton, reckless, unreasonable

and/or deliberately indifferent acts and omissions, the Shabazz family was robbed of their husband and father and deprived of his companionship and his financial, spiritual, emotional, and moral guidance and support, and sustained severe mental anguish and pecuniary losses caused by the death of their husband and father.

4.       As part of the fraudulent concealment and cover-up, the FBI and NYPD Defendants arrested several individuals who they alleged were involved in the assassination of Malcolm X and these false arrests resulted in the malicious prosecution and wrongful conviction of two innocent individuals, Muhammad Aziz and Khalil Islam.[1]

5.       This misconduct caused the incarceration and vilification of these two innocent men, and the suppression of the governmental role in the assassination of Malcolm X.

6.       For decades, Malcolm X's wife, Betty Shabazz, the Plaintiffs, and their entire family have suffered the pain of the unknown. They did not know who murdered Malcolm X, why he was murdered, the level of NYPD, FBI and CIA orchestration, the identity of the governmental agents who conspired to ensure his demise, or who fraudulently covered-up their role.

7.       Plaintiffs and the Shabazz family have lived their lives without a father and grandfather, along with a cloud of suspicion surrounding his death. The damage caused to the Shabazz family is unimaginable, immense, and irreparable.

8.       This claim is being advanced now because a reinvestigation coordinated by the efforts of the Shanie's Law Office, the Innocence Project, and the New York County District Attorney's Office ("DANY") Conviction Integrity Program recently uncovered the government's repeated failures, acts, and encouragement of the killers.

9.       As a result, in November of 2021, New York County District Attorney Cyrus R.

---

[1] Muhammad Aziz was also known as Norman 3X Butler and Khalil Islam was also known as Thomas 15X Johnson.

Vance took the unprecedented step of apologizing for "serious, unacceptable violations of law and the public trust," and revealed a number of crucial NYPD and FBI documents that had been fraudulently concealed for more than 56 years.

## NATURE OF THE ACTION

10.     Plaintiffs come before the Court advancing the following theories of liability against the Defendants. First, the NYPD, in coordination with Federal Defendants, possessed knowledge of threats to Malcolm X's life prior to his assassination, yet, failed to intervene on his behalf. Second, the NYPD, in coordination with Federal Defendants, intentionally removed their officers from inside the ballroom where Malcolm X was assassinated. Third, the NYPD, in coordination with Federal Defendants, caused the arrest of Malcolm X's security detail days before the assassination to leave him more vulnerable. Fourth, the Federal Defendants had personnel, including undercover personnel, in the ballroom during the assassination and they failed to protect Malcolm X from a known harm. Fifth, the Federal Defendants encouraged the assassination of Malcolm X. After the NYPD, in coordination with Federal Defendants, caused Malcolm X's death, they engaged in a decades-long effort to cover up their malfeasance. This coverup was fraudulent and denied the Plaintiffs access to the Courts.

11.     Plaintiffs bring this action to recover compensatory and punitive damages and an award of attorneys' fees and costs for violations of Plaintiffs' rights secured by 42 U.S.C. §§ 1981, 1983, 1985 and 1986, by the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution through the Federal Tort Claims Act ("FTCA"), and by New York state law.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4), Plaintiffs' FTCA claims pursuant to 28 U.S.C. §§ 1331 and 1346(b)(1),

and Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

13.    Venue is proper under 28 U.S.C. §§ 1391 and 1402(b) because Defendants conduct business in this judicial district, and substantial parts of the acts and/or omissions giving rise to the claims herein alleged occurred in this judicial district.

## NOTICE OF CLAIM

14.    This action is commenced 59 years after the assassination of Malcolm X because, following his death, Defendants knowingly and fraudulently withheld information from the Shabazz Plaintiffs. Defendants acted in a concerted and fraudulent manner to prevent the Shabazz Plaintiffs from becoming aware of their conduct, omissions, and actions, as well as the identity of undercover informants and the planning of Malcolm X's assassination.

15.    This action is timely brought due to the continuing fraudulent concealment by the DOJ, FBI, CIA, the NYPD, and their named and unnamed Defendant agents of direct evidence that they conspired to and executed their plan to assassinate Malcolm X and then covered it up.

16.    In February 2023, Plaintiffs presented timely Notices of Tort Claims, pursuant to the FTCA, 28 U.S.C. §§ 2671, *et seq.*; 2401; 2675(a) and all applicable federal regulations, giving notice of the wrongful death caused by the acts or omissions of the Defendants, while acting within the scope of their office or employment with the United States of America, under circumstances in which the United States, if a private person, would be liable to the Plaintiffs in accordance with the laws of the State of New York. More than six months have passed from the claims' presentation to the United States. Plaintiffs deem the agencies' failure to render a final disposition of their claims a constructive denial pursuant to 28 U.S.C. § 2675(a).

17.    On August 29, 2024, Ilyasah Shabazz was duly appointed as Administrator d.b.n. of the Estate of Malcolm X.

18.     On October 4, 2024, Plaintiffs filed a Notice of Claim against the City of New York on behalf of the Estate asserting, *inter alia*, wrongful death.

19.     On February 21, 2023, Plaintiff Ilyasah Shabazz filed a Notice of Claim against the City of New York seeking damages for the wrongful death of Malcolm X, her father.

20.     On February 21, 2023 and March 24, 2023, Plaintiff Ilyasah Shabazz filed a Notice of Claim against the State of New York seeking damages for the wrongful death of Malcolm X, her father.

21.     On February 21, 2023, Plaintiff Ilyasah Shabazz filed a Notice of Claim against the USA, CIA, FBI, and DOJ seeking damages for the wrongful death of Malcolm X, her father.

22.     On March 3, 2023 and March 7, 2023, Plaintiff Gamilah Lumumba Shabazz filed a Notice of Claim against the City of New York seeking damages for the wrongful death of Malcolm X, her father.

23.     On March 3, 2023, March 7, 2023, and March 24, 2023, Plaintiff Gamilah Lumumba Shabazz filed a Notice of Claim against the State of New York seeking damages for the wrongful death of Malcolm X, her father.

24.     On March 3, 2023, Plaintiff Gamilah Lumumba Shabazz filed a Notice of Claim against the USA, CIA, FBI, and DOJ seeking damages for the wrongful death of Malcolm X, her father.

25.     On March 27, 2023, Plaintiff Gamilah Lumumba Shabazz filed a Notice of Claim against the CIA seeking damages for the wrongful death of Malcolm X, her father.

26.     On March 3, 2023 and March 7, 2023, Plaintiff Malaak Shabazz filed a Notice of Claim against the City of New York seeking damages for the wrongful death of Malcolm X, her father.

27.    On March 3, 2023, March 7, 2023, and March 24, 2023, Plaintiff Malaak Shabazz filed a Notice of Claim against the State of New York seeking damages for the wrongful death of Malcolm X, her father.

28.    On March 3, 2023, Plaintiff Malaak Shabazz filed a Notice of Claim against the USA, CIA, FBI, and DOJ seeking damages for the wrongful death of Malcolm X, her father.

29.    On April 25, 2023, Plaintiff Malaak Shabazz filed a Notice of Claim against the CIA seeking damages for the wrongful death of Malcolm X, her father.

30.    As such, Plaintiffs have satisfied all conditions precedent to the institution of this action, and/or such conditions have been waived.

## THE PARTIES

### Plaintiffs

31.    At all times relevant herein, Malcolm X was a resident of the City of Elmhurst, New York, until his assassination on February 21, 1965. Malcolm X was 39 years old and a Black citizen of the United States at the time of his death.

32.    Betty Shabazz, his wife, was pregnant with twin girls he would unfortunately never meet. Malcolm X also left behind four young daughters, aged one, two, four, and six.

33.    Plaintiffs Ilyasah Shabazz, Gamilah Lamumba Shabazz, and Malaak Shabazz are daughters of Malcolm X.

34.    Plaintiff Ilyasah Shabazz is the duly appointed Administrator d.b.n. of the Estate of Malcolm X.

35.    Plaintiffs are all residents and citizens of the United States.

### Defendants

36.    The United States of America ("United States"), Department of Justice ("DOJ"),

the Federal Bureau of Investigation ("FBI"), the Central Intelligence Agency ("CIA"), and the New York City Police Department ("NYPD"), together with their leaders, agents and informants were aware of, and involved in, the assassination of Malcolm X, and knowingly failed to prevent it or to protect Malcolm X from being assassinated.

37.    The following named defendants, on behalf of, and in furtherance of the surreptitious, illegal and unconstitutional aims of their respective governmental agencies, together with named co-conspirators undercover within the Nation of Islam and others as yet still unknown, acted individually, jointly and in conspiracy, to proximately cause, by assassination, Malcolm X's wrongful death, failed to intervene to prevent the assassination, and/or fraudulently covered up their roles in said wrongful death: FBI Director J. Edgar Hoover; FBI Assistant Director William C. Sullivan; FBI Chief of Racial Intelligence George C. Moore; former Deputy Director of Plans of the CIA Richard McGarrah Helms; FBI Agents Arthur Fulton, August Micek, Dale Sutton and Steven Edwards; FBI informant-provocateurs John Ali Simmons and Abdul Basit Naeem; FBI informant Ronald Timberlake; CIA Director Richard Helms; the City Of New York; NYPD past Police Commissioners Vincent Lyons Broderick and Howard R. Leary; NYPD detectives, investigators and supervisors Ferdinand Cavallaro, Francis Cilento, William E. Confrey, John J. Conroy, Thomas T. Cusmano, Winston W. De Verge, Sanford Garelik, Joseph Iacovelli, John J. Keeley, Thomas C. Renaghan, Francis J.M. Robb, James Rushin, Howard G. Schaetzle, Francis M. Sullivan, Warren Taylor, Patrick J. Twomey, Ernest Vohs, and Michael Willis; NYPD BOSSI agents and supervisors Anthony ("Tony") Bouza, Gerry Fulcher, William ("Bill") Knapp, Bernard ("Barney") F. Mulligan, Eugene ("Gene") A. Roberts, Henry Suarez, Theodore ("Ted") Theologes, Raymond A. Wood, Anthony ("Tony") Ulasewicz; John and Jane Does 1 through 50, Inclusive, who are co-conspiring officials, agents and informants not presently known to Plaintiff;

and co-conspirators William Bradley, Leon Davis, Talmadge Hayer,[2] Benjamin Thomas and Wilbur McKinley.

38.     Defendants acted in a concerted and fraudulent manner to prevent Malcolm X's family from becoming aware of their conduct, omissions, actions, and failures to act, as well as the identity of undercover informants, agents, and provocateurs and their planning of Malcolm X's assassination.

39.     The NOI involvement and participation in the assassination resulted from the urging, threats, manipulation, facilitation and/or subversive use of informant-provocateurs and undercover agents by agents, supervisors, high level officials, and leaders of the FBI and NYPD.

## Federal Defendants

40.     Defendant the United States of America (hereinafter "the United States"), is a Defendant in this action pursuant to the FTCA, 28 U.S.C. § 1346. The relevant conduct of the United States arises from the acts and/or omissions of employees and agents of the Federal Bureau of Investigation ("FBI"), the Department of Justice ("DOJ"), and the Central Intelligence Agency ("CIA") that  under the laws of the State of New York based on the negligent or otherwise wrongful acts or omissions of individual agents of the FBI while acting within the scope of their office or employment by the FBI and/or DOJ pursuant to 28 U.S.C. § 2671, *et seq.* Defendant United States was at all times material to this Complaint the employer of the individual Federal Defendants.

41.     If Defendant United States were a private person, it would be liable to Plaintiffs in accordance with the laws of the State of New York, the place where the actions and omissions at issue herein occurred or should have, but did not, occur.

42.     Defendant J. Edgar Hoover ("Hoover") was the creator, former Director, and final

---

[2] Also known as Thomas Hagan and Mujahid Abdul Halim.

policymaker for the FBI until he died in 1972. At all times relevant to this action, Defendant Hoover, individually, and by his agents, servants, and employees, was responsible for the operation, maintenance, and control of the FBI. Defendant Hoover oversaw the selection, training, supervision, and discipline of FBI agents from 1956 to 1972, including at the time of the 1965 assassination of Malcolm X. He participated in the assassination of Malcolm X, and/or knew about it happening and did not act to prevent it and participated in the subsequent cover-up. Defendant Hoover by and through his estate, is sued in his individual capacity as a conspirator with the NYPD defendants.

43.    Defendant William C. Sullivan, between 1969 and 1970, was Assistant Director of the FBI, in charge of the Domestic Intelligence Division, and a primary architect of the Counterintelligence Program ("COINTELPRO"). At all times relevant to this action, Defendant Sullivan was responsible for the operation, maintenance, and control of COINTELPRO; the selection, training, supervision, and discipline of COINTELPRO agents from 1961 to 1971, including at the time of the 1965 assassination of Malcolm X. He participated in the assassination of Malcolm X, and/or did not act to prevent it, and participated in the subsequent cover-up. Defendant Sullivan, by and through his estate, is sued in his individual capacity as a conspirator with the NYPD defendants.

44.    Defendant George C. Moore was the head of the FBI's Racial Intelligence Section, and as such, was responsible for the COINTELPRO operations directed against Black leaders and organizations. He participated in the assassination of Malcolm X, and/or did not act to prevent it, and participated in the subsequent cover-up. Defendant Moore, by and through his estate, is sued in his individual capacity as a conspirator with the NYPD defendants.

45.    Defendant Richard McGarrah Helms ("Helms") was the former Deputy Director of

Plans of the CIA and former Director of the CIA from 1966 to 1973. He participated in the assassination of Malcolm X, and/or did not act to prevent it, and participated in the subsequent cover-up. Defendant Helms, by and through his estate, is sued in his individual capacity as a conspirator with the NYPD defendants.

46.     Defendant Arthur Fulton ("Fulton") was an agent for the FBI. He participated in the assassination of Malcolm X, and/or did not act to prevent it, and participated in the subsequent cover-up. Defendant Fulton is sued in his individual capacity as a conspirator with the NYPD defendants.

47.     Defendants August Micek, Dale Sutton, and Steven Edwards were FBI agents who participated in the cover-up of the assassination of Malcolm X. They are sued in their individual capacities as a conspirator with the NYPD defendants.

48.     Defendant John Ali Simmons ("Ali"), also known as John Ali and John X, was the former National Secretary for the Nation of Islam and an FBI informant-provocateur assigned to infiltrate the NOI at the behest of the FBI. He participated in the assassination of Malcolm X, and/or did not act to prevent it, and participated in the subsequent cover-up.  He is sued in his individual capacity and as a conspirator with the NYPD defendants.

49.     Defendant Abdul Basit Naeem ("Naeem") was, upon information and belief, an FBI informant-provocateur assigned to infiltrate the NOI at the behest of the FBI. He participated in the assassination of Malcolm X, and/or did not act to prevent it, and participated in the subsequent cover-up.  He is sued in his individual capacity and as a conspirator with the NYPD defendants.

50.     Defendant Ronald Timberlake ("Timberlake") was an informant for the FBI who participated in the cover-up of the assassination of Malcolm X. He is sued in his individual capacity

and as a conspirator with the NYPD defendants.

51.     Defendant John and Jane Does 1-20 are federal agents, informants, and provocateurs employed by the FBI and the CIA whose identities and actions in the assassination and cover-up have heretofore been, and continue to be, suppressed by themselves, by Defendants Hoover, Sullivan, Moore, Fulton, Helms, Edwards, Sutton, Ali, Timberlake, Naheem, and other leaders, agents and informants of the FBI and CIA.

52.     All of the actions taken by the Federal Defendants were undertaken under federal law as well as with co-conspirators acting under state law.

### Defendant City of New York

53.     Defendant the City of New York ("the City"), at all times herein mentioned, was a municipal corporation that is a political subdivision of the State of New York, was the employer of the individual police Defendants, and is and was at all times relevant herein responsible for the policies, practices, and customs of the New York City Police Department ("NYPD").

54.     All the acts of the City, its agents, and employees, including the individual NYPD Defendants named herein, were carried out under the color of state law.

55.     The City was at all times relevant, the public employer of the individual NYPD Defendants and Does 21-50, inclusive, and is legally responsible for torts these Defendants committed within the scope of their employment or under color of law. The City is also obligated under the law and by contract to indemnify and defend the individual Defendants named herein.

56.     Defendant City is also sued for the deprivation of civil rights by the failure of these governmental entities to properly train, hire, supervise and discipline their law enforcement employees, and through *respondeat superior* for the wrongful conduct of their public employee agents.

15

**Former NYPD Commissioner Defendants**

57.    Defendant Vincent Lyons Broderick ("Broderick"), a former NYPD Commissioner, was an employee and agent of the NYPD, acting within the scope of his employment and under color of law as the final policymaker for the City with respect to NYPD supervision and discipline from 1965 to 1966, including during the 1965 assassination of Malcolm X. At all times relevant to this Complaint, he was responsible for the policies, practices, supervision, implementation, and conduct of all NYPD matters and responsible for the appointment, training, supervision, discipline and conduct of all the NYPD members of service including the highest-ranking NYPD personnel. He participated in the planning of the assassination of Malcolm X, and/or did not act to prevent it, and participated in the subsequent cover-up. Defendant Broderick is being sued in his individual capacity.

58.    Defendant Howard R. Leary ("Leary"), a former NYPD Commissioner, was an employee and agent of the NYPD, acting within the scope of his employment, under color of law, and as the final policymaker for the City with respect to NYPD supervision and discipline from 1966 to 1970, including during the investigation into the 1965 assassination of Malcolm X. At all times relevant to this complaint, he was responsible for the policies, practices, supervision, implementation, and conduct of all NYPD matters and responsible for the appointment, training, supervision, discipline and conduct of all the NYPD members of service including the highest-ranking NYPD personnel. He participated in the cover-up of the assassination of Malcolm X. Defendant Leary is sued in his individual capacity.

**NYPD BOSSI Defendants**

59.    Defendant Anthony (Tony) Bouza ("Bouza") is a former NYPD officer and member of the New York City Police Department Bureau of Special Services and Investigations

16

("BOSSI").    At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant City, holding ranks that included Lieutenant from 1957 to 1965. Defendant Bouza acted in the conspiracy to assassinate Malcolm X and/or in the assassination investigation under color of law and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and the City. Defendant Bouza participated in the assassination of Malcolm X, and/or did not act to prevent it, and/or participated in its subsequent cover-up. Defendant Bouza, by and through his estate, is sued in his individual capacity.

60.    Defendant Gerry Fulcher ("Fulcher") is a former NYPD officer and BOSSI member. At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant City. Defendant Fulcher acted in the conspiracy to assassinate Malcolm X and/or in the assassination investigation under color of law and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and the City. Defendant Fulcher participated in the assassination of Malcolm X, and/or did not act to prevent it, and participated in the subsequent cover-up. Defendant Fulcher is sued in his individual capacity.

61.    Defendant William (Bill) Knapp ("Knapp") is a former NYPD officer and BOSSI member. At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant City, holding ranks that included Deputy Chief Inspector. Defendant Knapp acted in the conspiracy to assassinate Malcolm X and/or in the assassination investigation under color of law and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and the City. Defendant Knapp participated in the assassination of Malcolm X, and/or did not act to prevent it, and participated in the subsequent

cover-up. Defendant Knapp is being sued in his individual capacity.

62.    Defendant Bernard (Barney) F. Mulligan ("Mulligan") is a former NYPD officer and BOSSI member. At all relevant times, he was a duly appointed and acting officer of the NYPD employed by the City, holding ranks that included Lieutenant. Defendant Mulligan acted in the conspiracy to assassinate Malcolm X and/or in the assassination investigation under color of law and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and the City. Defendant Mulligan participated in the assassination of Malcolm X, and/or did not act to prevent it, and participated in the subsequent cover-up. Defendant Mulligan is sued in his individual capacity.

63.    Defendant Eugene (Gene) A. Roberts ("Roberts") is a former NYPD officer and BOSSI member. At all relevant times, he was employed by the City. Defendant Roberts acted in the conspiracy to assassinate Malcolm X and/or in the assassination investigation under color of law and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and the City. Defendant Roberts participated in the assassination of Malcolm X, and/or did not act to prevent it, and participated in the subsequent cover-up. He is sued, by and through his Estate, in his individual capacity.

64.    Defendants Henry Suarez ("Suarez"), Theodore (Ted) Theologes ("Theologes"), and Tony Ulasewicz ("Ulasewicz") were former NYPD officers and BOSS members. At all relevant times, they were duly appointed, and acting officers of the NYPD employed by Defendant City, holding ranks that included Detective. These Defendants acted in the conspiracy to assassinate Malcolm X and/or in the assassination investigation under color of law and within the scope of their employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and the City. These Defendants participated in the assassination

18

of Malcolm X, and/or did not act to prevent it, and participated in the subsequent cover-up. These Defendants are sued in their individual capacities.

65.    Defendant Raymond A. Wood ("Wood") is a former NYPD officer and BOSSI member. At all relevant times, he was employed by Defendant City. Defendant Wood acted in the conspiracy to assassinate Malcolm X and in the assassination investigation under color of law and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and the City. Defendant Wood participated in the assassination of Malcolm X and/or did not act to prevent it and participated in the subsequent cover-up. Defendant Wood, by and through his estate, is sued in his individual capacity.

66.    Defendant John and Jane Does 21-35 are NYPD BOSSI leaders, agents, officers, informants, and provocateurs employed by the NYPD, who were acting under color of law and within the scope of their employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and the City, and  whose identities and actions in the assassination of Malcolm X, and/or the failure to prevent it, and its cover-up have heretofore been, and continue to be, suppressed by said Defendant Does, and by the NYPD and Federal Defendants named herein.

**NYPD Investigators, Detectives and Supervisors Defendants**

67.    Defendants Ferdinand (Rocky) Cavallaro ("Cavallaro"), William E. Confrey ("Confrey"), John J. Conroy ("Conroy"), Thomas T. Cusmano ("Cusmano"), Winston W. De Vergee ("De Vergee"), Joseph Iacovelli ("Iacovelli"), John J. Keeley ("Keeley"), James Rushin ("Rushin"), Howard G. Schaetzle ("Schaetzle"), Warren Taylor ("Taylor"), Patrick J. Twomey ("Twomey"), Ernest Vohs ("Vohs"), and Michael Willis ("Willis") are former officers of the NYPD. At all relevant times, these Defendants were duly appointed, and acting officers of the

19

NYPD employed by Defendant City, holding ranks that included Detective.

68.    Defendant Francis ("Frank") Cilento ("Cilento") is a former officer of the NYPD. At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant City, holding ranks that included Sergeant.

69.    Defendant Sanford Garelik ("Garelik") is a former officer of the NYPD. At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant City, holding ranks that included Chief Inspector.

70.    Defendant Thomas C. Renaghan ("Renaghan") is a former officer of the NYPD. At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant City, holding ranks that included Assistant Chief Inspector.

71.    Defendant Francis ("Frank") J.M. Robb ("Robb") is a former officer of the NYPD. At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant City, holding ranks that included Inspector.

72.    Defendant Francis M. Sullivan ("Francis Sullivan") is a former officer of the NYPD. At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant City, holding ranks that included Lieutenant.

73.    At all relevant times, these NYPD Defendant investigators, detectives and supervisors acted under color of law and within the scope of their employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and the City. These Defendants participated in the conspiracy to cover-up the true nature of the assassination of Malcolm X. These Defendants are being sued in their individual capacities.

74.    Defendant John and Jane Does 36-50 were NYPD leaders, agents, officers, investigators, and informants employed by the NYPD who were acting under color of law and

within the scope of their employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and the City, and whose identities and actions in the cover-up of the assassination of Malcolm X have heretofore been, and continue to be, suppressed by themselves, and by the NYPD and FBI Defendants named herein.

### John Doe Defendants

75.     The true names and capacities of the Defendants named herein as Does 1 through 50 ("Does 1-50") are unknown to Plaintiffs, who therefore sue said Defendants by such fictitious names. As a result of pending discovery from Defendants herein, upon information and belief, Some or all of Does 1-50 in this action will be identified as time proceeds. Plaintiffs will seek to amend this Complaint to show the true names and capacities when they have been ascertained.

76.     The same set of allegations and general facts alleged herein will apply to the Doe Defendants in terms of their culpability and amenability to suit under the legal theories expressed. Plaintiffs are informed and believe, and based thereon allege, that Does 1-50 were officers, informants, and/or supervisors in the FBI, CIA, and/or NYPD who acted in the conspiracy to assassinate Malcolm X, and/or failed to prevent the assassination, and/or participated in the assassination cover-up under color of law and within the scope of their employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and the City; and who participated in the misconduct alleged herein; but whose actual names Plaintiffs have been unable to ascertain notwithstanding reasonable efforts to do so.

77.     Plaintiffs are informed and believe, and based thereon allege, that at all times herein mentioned, each of the Defendants, including the Doe Defendants, were the agents of one or more of the other Defendants and were at all times herein mentioned acting within the scope of such agency. Defendant Does 1-50 are sued herein in their individual capacities.

78.    On information and belief, all Defendants are residents and citizens of the United States.

**Co-Conspirators Within the NOI**

79.    NOI lieutenant William Bradley and NOI members Leon Davis, Talmadge Hayer, Benjamin Thomas, and Wilbur McKinley are co-conspirators who acted together and in conspiracy with some of the named FBI, NYPD, and CIA Defendants to assassinate Malcolm X, and all of them except Hayer also acted together and in conspiracy with the named FBI, NYPD and CIA Defendants to cover-up their roles in the assassination.

## STATEMENT OF FACTS

**Malcolm X, the 1960s, and the Assault on the Black Liberation Movement.**



[3]

*"If Malcolm X cannot get justice — if we cannot get justice in one of the most high-profile assassinations in U.S. history, what does that say about the capacity of our criminal legal system to provide justice to the thousands of Black people who are murdered every day or the tens of thousands of Black men who have been convicted of crimes that they did not commit."*[4]

### Malcolm X's Early Life

80.    Louise Little ("Mrs. Little") and her husband, Reverend Earl Little ("Rev. Little"), were active members of the Universal Negro Improvement Association and African Communities League ("UNIA-ACL").

81.    The UNIA-ACL was a "social, friendly, humanitarian, charitable, educational, institutional, constructive, and expansive society…founded by persons desiring to the utmost to

---

[3] Eddie Adams, Photograph of Malcolm X on March 5, 1964, posing during an interview in New York, *in* The Associated Press.
[4] Elizabeth Hinton, an associate professor of history and African American studies at Yale University and the author of *America on Fire: The Untold History of Police Violence and Black Rebellion Since the 1960s*.

work for the general uplift of the Negro peoples of the world,"[5] co-founded by Marcus Garvey ("Garvey").

82.      Due to Mrs. and Rev. Little's involvement in the UNIA-ACL, the Little family was constantly threatened by white supremacist terrorist groups such as the Ku Klux Klan ("KKK") and the Black Legion.

83.      In 1931, Rev. Little was struck and killed by an unknown vehicle. It was suspected that a white supremacist group planned and orchestrated his death because of his work with the UNIA-ACL.

84.      When Malcolm X was in the eighth grade, he expressed interest in becoming a lawyer, and his white teacher responded that it was "no realistic goal for a nigger."[6]

### The Nation of Islam and Islam

85.       Malcolm X was imprisoned from 1946 to 1952.

86.      During his incarceration, two of Malcolm X's brothers introduced him to the teachings of Elijah Muhammad. Malcolm X subsequently joined the Nation of Islam ("NOI").

87.      In accordance with NOI tradition of distancing oneself from family names originating from white enslavers, Malcolm X replaced his surname, "Little," with "X."

88.       Over the next several years, Malcolm X ascended the ranks of the NOI, becoming the National Spokesman for its leader, Elijah Muhammad.

89.      In 1964, Malcolm X converted to Islam and left the NOI. He then adopted the name El-Hajj Malik El-Shabazz.

90.      The NOI should not be confounded with the mainstream Abrahamic religion of

---

[5] *(1918) Constitution of The Universal Negro Improvement Association*, Blackpast, https://www.blackpast.org/african-american-history/constitution-universal-negro-improvement-association-1918/.
[6] Wieder, Alan. "Chapter 2: Robert Coles Reconsidered: A Critique of the Portrayal of Blacks as Culturally Deprived." *Counterpoints* 47 (1997): 29. http://www.jstor.org/stable/42975180.

Islam, as they are two distinct faiths. There are several critical differences between the NOI and the mainstream Abrahamic religion of Islam; many are core theological principles.

### Malcolm X - A Powerful and Inspiring Black Leader

91.    Malcolm X traveled nationally and internationally, advocating for the Black community in the United States and abroad, relentlessly highlighting the mistreatment, oppression, and inequities that Black people endure daily.

92.    He advocated for many issues affecting the Black community that persist today, such as Voter I.D. laws that hinder minority voters. He addressed the importance of the Black vote, stating, "[w]hen white people are evenly divided, and Black people have a bloc of votes of their own, it is left up to them to determine who's going to sit in the White House and who's going to be in the doghouse."

93.    Malcolm X also addressed police brutality and the over-policing of Black neighborhoods, stating, "[w]henever something happens, 20 police cars swarm on one neighborhood." "This force . . . creates a spirit of resentment in every Negro. They think they are living in a police state and they become hostile toward the policeman."

94.    On June 28, 1964, Malcolm X spoke at the founding rally for the Organization of Afro-American Unity ("OAAU"). In his address to the audience, he stated, "we must take [the problem of the Black man] out of the hands of the United States government. And the only way we can do this is by internationalizing it and taking advantage of the United Nations Declaration of Human Rights, the United Nations Charter on Human Rights, and on that ground bring it into the U.N. before a world body [wherein] we can indict Uncle Sam for the continued criminal injustices that our people experience in this government."[7]

---

[7] [9] Malcolm X, Address at the founding rally for the OAAU (June 28, 1964).

95.     In a visit to Cairo, Egypt, in July 1964, Malcolm X delivered a memorandum to the heads of state at the Cairo conference requesting their support, stating: "[t]he American Government is either unable or unwilling to protect the lives and property of your 22 million African American brothers and sisters. We stand defenseless, at the mercy of American racists who murder us at-will for no reason other than we are Black and of African descent."[8]

96.     On January 5, 1965, Malcolm X appeared on the CBC show Front Page Challenge, stating: "We believe that our problem is not a violation of civil rights but a violation of human rights. Not only are we denied the right to be a citizen in the United States, we are denied the right to be a human being."[9]

97.     He planned to take the cause to the United Nations, charging the U.S. government with failure to protect its Black citizens from racist white terrorism.

98.     Malcolm X was fearless, uncompromising, and unapologetically proud to be Black.

**J. Edgar Hoover**

99.     J. Edgar Hoover was the founder of the FBI. Many of Defendant Hoover's practices were focused on suppressing and oppressing the American people and violating their constitutional rights.

*The Bureau of Investigation*

100.     The Bureau of Investigation, the precursor to the FBI, was the beginning of Defendant Hoover's national attack on Black activists.

101.     In October 1919, Defendant Hoover targeted activist Marcus Garvey.

102.     Defendant Hoover planted informants and undercover agents inside Garvey's organization, the UNI-ACL, attempting to implicate Garvey for any crimes that would prevent his

---

[8] [10] Malcolm X, Address at the African Summit Conference (Aug. 21, 1964).
[9] Interview with Malcolm X, Front Page Challenge (CBC television broadcast Jan. 5, 1965).

work in mobilizing the Black movement.

103.    Garvey would be convicted of mail fraud in 1923 after years of Defendant Hoover's and the federal government's witch hunt to persecute him. Garvey was imprisoned and subsequently deported back to his homeland of Jamaica. This was the first, but certainly not the only, time Defendant Hoover and the FBI installed informants, provocateurs, or undercover agents inside Black organizations to disrupt Black leaders and activism.

104.    With their actions, Hoover and the U.S. government silenced the voice of an important Black leader.

### The FBI and COINTELPRO

105.    For many decades, the FBI and its leaders have viewed Black activism as a potential national security threat.

106.    In 1956, Defendant Hoover codified a secret, nationwide, and illegal FBI program known as the Counterintelligence Program or "COINTELPRO."

107.    As described in a 1964 memo from Defendant Hoover, Defendant Sullivan, and other high-level FBI officials to the personal attention of the Special Agents in Charge of the New York, Chicago, and Washington D.C. Offices, this program had "disrupted, exposed, and neutralized the communists."

108.    In this memo, Hoover and Sullivan described and embraced the past, present, and future utilization of this highly illegal and unconstitutional program:

Over the years, our approach to investigative programs in the intelligence field has given rise to a number of new programs, some of which have been most revolutionary, and it can be presumed that with continued aggressive approach to these problems, new and productive ideas will be forthcoming. These ideas will not be increased in number or improved upon from the standpoint of accomplishments merely through the institution of a program such as COINTELPRO which is given another name and in fact only encompasses everything that has been done in the past or will be done in the future.

109.    As the Black liberation struggle gained momentum in the late 1950s and early 1960s, Hoover, Sullivan, and the FBI, with a shared racial and political animus, shifted the main focus of their illegal and unconstitutional COINTELPRO program to that movement and its leaders.

110.    As described in an August 1967 memo from Hoover and his high-level assistants to all FBI field offices, including New York, Chicago, Newark, Boston, and Washington D.C, the purpose of these super-secret and "sensitive" COINTELPRO "operations and techniques" was "to expose, disrupt, misdirect, discredit, or otherwise neutralize the activities of [B]lack nationalist, hate-type organizations and groupings, their leadership, spokesmen, membership, and supporters, and to counter their propensity for violence and civil disorder."

111.    Not only did COINTELPRO target and surveil Malcolm X, but it also targeted other well-known Black activists and groups, labeling them as "Black Extremists" or "Black Nationalist Hate Groups." COINTELPRO's focus included the Rev. Dr. Martin Luther King Jr. ("MLK"), the Black Panther Party, Fred Hampton, Kwame Toure (AKA Stokely Carmichael), Elijah Muhammad, the Mississippi Freedom Democratic Party, and many others.

112.    A March 1968 memo from Defendants Hoover, Sullivan, Moore, and other high-level FBI officials to all FBI Special Agents in Charge, including New York, Chicago, New York, Newark, Boston, and Washington, DC, again underscored COINTELPRO's illegal and unconstitutional focus, past, present and future, on Black activism, its leaders, and movements.

113.    Thus, Hoover, Sullivan, and their associates wrote in this memo that this continuing war on the Black movement was designed to "[p]revent the rise of a 'messiah' who could unify and electrify the militant [B]lack nationalist movement," to "prevent coalitions of militant black nationalist groups," and to "prevent militant Black nationalist groups and leaders from gaining

respectability."

114.    In this memo, Hoover identified Malcolm X, Elijah Muhammad, Dr. Martin Luther King Jr., and Stokely Carmichael as targeted "messiahs" and the Southern Christian Leadership Conference, and the Nation of Islam among the targeted Black organizations.

115.    The methods included informant-driven disinformation campaigns designed to spark conflict within the movement, discourage donors and supporters, and even break up marriages. The overt investigative activity was also used, as "one stated goal of the COINTELPRO program was to inspire fear among activists by convincing them that an FBI agent lurked behind every mailbox."

116.    The illegal and unconstitutional FBI methods, directed, approved and implemented by Defendants Hoover, Sullivan, and their FBI associates, also included, *inter alia*, burglaries ("black bag jobs"), setting up wrongful arrests and prosecutions, working with local police to plan and implement violent police raids, using their informant-provocateurs to encourage illegal activities, and falsely accusing leaders and members of Black movement organizations of being informants ("snitch jackets").

117.    These methods and tactics also included working with, and otherwise utilizing local law enforcement agencies, including but not limited to the NYPD, in implementing and accomplishing their unconstitutional and illegal goals.

118.    Throughout Defendant Hoover's career, he targeted some of the most pivotal Black voices, and organizations including but not limited to: Malcolm X (assassinated); Dr. Martin Luther King Jr. (assassinated); Black Panther Party leader Fred Hampton (murdered by the Chicago Police Department in conspiracy with the FBI and COINTELPRO); Marcus Garvey (imprisoned and deported); SNCC leader Stokely Carmichael (circulated rumor that he was a CIA

informant and that the Black Panther Party was out to kill him); Black Panther Alprentice "Bunchy" Carter (shot and killed by a member of the Organization US (United Slaves) orchestrated by COINTELPRO); The Black Panther Party (the Senate Select Committee on Intelligence found that the FBI had a "covert action program to destroy the Black Panther Party"); Geronimo Pratt (falsely imprisoned for twenty-seven years after the FBI sought to "neutralize" Pratt "as an effective [Black Panther Party] functionary").

119.    In the early and mid-1960s, Defendants Hoover and Sullivan and their FBI associates kept evidence of their agents' illegal and unconstitutional activities in a super-secret "Do Not File File." In 1972, after Hoover's death, his personal secretary destroyed, pursuant to his instruction, 30-32 file drawers of Hoover's personal files, which Defendant Sullivan described as being "really filled with material . . . they were just loaded." It was later reported that 40% of evidence relevant to the prosecution of FBI agents for illegal and unconstitutional activities had been destroyed in the New York and Washington D.C. offices.

120.    To this date, FBI documents, including those relevant to this complaint that have been publicly revealed rather than destroyed or still suppressed, contain deletions of crucial names and conduct. On information and belief, there is more information that exists in government archives that would further substantiate these allegations.

**The NYPD and Bureau of Special Services and Investigations ("BOSSI")**

121.    BOSSI was variously known as the "Bureau of Special Services and Investigations," the "Bureau of Special Services" (its name in 1965), the "Special Services Division," and "Special Intelligence Services." It began as the "Red Squad," a unit meant to target alleged communists during the McCarthy era, before expanding its investigations to include other groups perceived as threatening or as enemies of the status quo.

122.     As an intelligence gathering unit, BOSSI infiltrated, conducted countermeasures, and spied on individuals and political and social groups. Its list of targets in the 1960s included Malcolm X, the OAAU, the NOI, the Black Panther Party, and numerous other Black leaders and organizations.

123.     "BOSSI's commander for the deep cover operation against Malcolm was Defendant Tony Ulasewicz, who was later exposed during the Senate Watergate hearings as President Richard Nixon's private detective for covert 'dirty tricks'

124.     During the relevant period, neither the City nor the NYPD implemented adequate rules or regulations to ensure that BOSSI operated within the confines of the law. BOSSI had a broad and nebulous mandate, virtually no limiting operational standards, and no independent audits or other procedures in place for external review.

125.     With no guidelines or restraints imposed by the City of New York, BOSSI was an instrument of abuse that freely and routinely engaged in unconstitutional and illegal tactics. BOSSI agents (1) infiltrated entire communities despite there being no evidence of criminal activity warranting such sweeping or protracted surveillance; (2) engaged in unlawful electronic surveillance, searches, and seizures; (3) infiltrated organizations with informants and undercover agents who provoked and induced individuals to commit crimes; (4) maintained and indiscriminately disseminated political dossiers on individuals and groups engaged in legal conduct; and, (5) spread false information intended to cause dissension.

126.     BOSSI operated under extreme secrecy. Undercover agents were not listed as BOSSI or NYPD operatives on any official roster, salary chart, or budget, and they did not appear on any official record connecting them to the NYPD. Identities of fellow BOSSI agents, even those of agents working on the same assignment or targeting the same individual, were withheld from

one another. Agents reported to different offices on different days of the week in different parts of the city.

127.    As a matter of policy, custom, and practice, BOSSI and the NYPD suppressed information to protect the BOSSI surveillance machinery and the identities of its undercover agents.

128.    BOSSI was headquartered in a separate building far removed from other police offices, partly to shield it from departmental, press, and public scrutiny. Additionally, it was headed by a deputy inspector who reported directly to the first deputy commissioner, bypassing typical lines of reporting within the police department.

### The FBI Targets Malcolm X

129.    The FBI first opened a file on Malcolm X in March 1953.

130.    At the same time, BOSSI agents infiltrated many New York political organizations, including the Nation of Islam.

131.    In November 1959, the FBI Office in New York sent a report to Defendant Hoover stating that Malcolm X had become Elijah Muhammad's "heir apparent." Pursuant to this revelation, FBI Defendants Hoover, Sullivan, and their COINTELPRO program focused on "disabling the [NOI] movement by neutralizing Malcolm X."

132.    On May 22, 1960, Assistant FBI Director Cartha DeLoach approved sending an anonymous letter about Elijah Muhammad's alleged extramarital affairs to his wife and various NOI ministers.

133.    Subsequently, Malcolm X became verbal and public about his criticisms of what he considered Elijah Muhammad's moral transgressions.

134.    To fuel more divisiveness between Malcolm X and Elijah Muhammad, on July 31,

1962, FBI Defendant William Sullivan approved another set of manipulative letters to be sent to Elijah Muhammad's followers and other individuals regarding his alleged extramarital affairs. Defendant Sullivan specified to the Chicago Special Agent in Charge that the "letters should be mailed at staggered intervals using care to prevent any possibility of tracing the mailing back to the FBI."

135.    Then, on December 1, 1963, Malcolm X commented on President John F. Kennedy's ("JFK") assassination after Elijah Muhammad specifically stated that no NOI members should make public statements regarding JFK's death.

136.    Due to the publicity and the mischaracterization of Malcolm X's statement that the assassination was a result of "chickens coming home to roost," Elijah Muhammad put Malcolm X on a 90-day "period of silence."

137.    The FBI Defendants again attempted to exploit the dissension between Malcolm X and Elijah Muhammad when an agent visited Malcolm X's home on February 4, 1964—one year before his assassination.

138.    Malcolm X secretly recorded the conversation in which the FBI agents attempted to build a rapport with Malcolm X by sympathizing with his situation. When that was unsuccessful, the agents switched tactics and stated, "[w]e talk to people every day who hate the Government or hate the FBI. That is why they pay money, you know." This attempt to bribe Malcolm X was also unsuccessful.

139.    On March 8, 1964, Malcolm X announced his departure from the NOI and his plan to create his own Black Nationalist party.

140.    Subsequently, Elijah Muhammad ordered Malcolm X to surrender his home and car, which the NOI owned. On March 10, 1964, NOI Captain Joseph ("Joseph"), also known as

Maceo X, and a squad arrived at Malcolm X's East Elmhurst home in Queens. Joseph served Malcolm X with eviction papers and demanded that he surrender all property belonging to the NOI.

141.    On March 30, 1964, the FBI New York Special Agent in Charge ("FBI NY-SAC") sent a memorandum to Defendant Hoover regarding the illegal surveillance of Malcolm X's home.

142.    On or about April 1, 1964, Defendant Hoover recommended the illegal "technical surveillance at the residence of Malcolm X. Little, 23-11 97th Street, East Elmhurst, Queens, New York, or at any address to which he may move in the future."

143.    BOSSI Defendant Gerry Fulcher admitted decades later that he was designated to control the illegal wiretapping of Malcolm X at the OAAU headquarters in the Theresa Hotel. Defendant Fulcher illegally listened to Malcolm X and the OAAU's telephone calls, and every evening, he would transport his surveillance tapes to a municipal and federal intelligence division.

144.    Shortly thereafter, on or about June 5, 1964, Defendant Hoover sent a telegram to the FBI office in New York City stating, "do something about Malcolm X."

145.    On December 1, 1964, Malcolm X's friend Alex Quaison-Sackey ("Quaison-Sackey") of Ghana was elected president of the United Nations General Assembly. Quaison-Sackey was vocal about his disapproval of U.S. policies. FBI NY-SAC sent a memorandum to Defendant Hoover on December 3, 1964, stating that "additional coverage of [Malcolm X's] activities is desirable particularly since he intends to have the Negro question brought before the United Nations."

146.    A 1969 COINTELPRO memorandum from the FBI's Chicago Special Agent in Charge ("FBI Chicago-SAC") to Defendant Hoover and his FBI COINTELPRO associates discussed the FBI's calculated process in sowing dissent between the NOI and Malcolm X. "Over

the years, considerable thought has been given and action taken with Bureau's approval, relating to methods through which the NOI, could be discredited in the eyes of the general [B]lack populace. ... Or through which factionalism among the leadership could be created ... Factional disputes have been developed—the most notable being MALCOLM X LITTLE."

147.    In reply to Defendant Hoover and his FBI associates, FBI Chicago-SAC wrote that "at present Chicago does not desire to rehash some of the exposes that occurred around the time of the defection of Malcolm X Little as top level sources could be endangered and future activities thereof curtailed."

**The Defendants Knew Malcolm X was in Imminent Danger and Marked for Death**

148.    Encouraged by the surreptitious disruption of the FBI and BOSSI Defendants, the NOI labeled Malcolm X as a primary threat to their organization and its leader, Elijah Muhammad.

149.    The FBI kept tabs on Malcolm X everywhere he went, including overseas. On his visit to Egypt in February 1964, he was poisoned. Malcolm X wrote a letter to his friend in Harlem, stating, "You must realize that what I am trying to do is very dangerous because it is a direct threat to the entire international system of racist exploitation.… Therefore, if I die or am killed before making it back to the States, you can rest assured that what I've already set in motion will never be stopped … Our problem has been internationalized."

150.    On March 10, 1964, Malcolm X told Ebony magazine that the NOI leaders have "got to kill me. They can't afford to let me live. I know too much. I know where the bodies are buried. And if they press me, I'll exhume some."

151.    The day after Malcolm X stated that "the NOI would even commit murder to keep this secret quiet," he received a recorded telephone message telling him that he was "as good as dead."

152.    In a now declassified FBI document, the FBI NY-SAC wrote, "[t]he March 21, 1964, edition of the New York Amsterdam News contained an article on page 50 which reflected that [Malcolm X] claimed that officials at NOI Mosque No. 7 had tried to persuade NOI members that he was insane after his suspension in December 1963. After these NOI officials believed they had turned enough NOI members against him, [Malcolm X] alleged that they sent a brother out to kill him in cold blood during February 1964, but because truth was stronger than falsehood the brother did not believe the charge and instead of killing [Malcolm X] told him of the plot and of the actions of NOI officials."

153.    On April 3, 1964, in Malcolm X's famous "The Ballot or the Bullet" speech, he emphasized the importance of the issue of racism becoming an international cause. "When you expand the civil-rights struggle to the level of human rights, you can then take the case of the Black man in this country before the nations in the UN. You can take it before the General Assembly. You can take Uncle Sam before a world court."

154.    On June 4, 1964, Malcolm X appeared on a Philadelphia radio program "Judge Rainey's Listening Post" on WDAS-FM and stated that Defendant Ali, who was the National Secretary of the NOI and secretly also a high-level FBI informant-provocateur, only wanted to "get all the money out of [the NOI] he possibly [could]."

155.    On June 8, 1964, the FBI surveilled Malcolm X while he was discussing an appearance on Columbia Broadcasting System (CBS) Television, where he would share the full story of Elijah Muhammad's extramarital affairs.

156.    An FBI memorandum documenting the surveillance states that "Malcolm X told [BUREAU REDACTED] that his life is at stake because he poses a threat to the NOI since public revelation of [Elijah Muhammad's extramarital affairs] would cause NOI members to desert Elijah

Muhammad."

157.    That same day, Malcolm X received a recorded telephone message telling him that he was "as good as dead."

158.    On or about June 12, 1964, Malcolm X received an anonymous phone call at 1:40 p.m. stating that he would be "bumped off."

159.    Later that same day, Malcolm X appeared on the Jerry Williams Radio Program on WMEX in Boston.    Williams introduced Malcolm X as the former spokesman for Elijah Muhammad and the Muslims. He mentioned he had heard that Malcolm X had received death threats earlier that day. Malcolm X responded that he had received repeated death threats over the preceding five months.

160.    Malcolm X then declared to Williams that Defendant Ali, his former friend, was also on a radio program recently called the "Hot Line." During Defendant Ali's appearance on the show, a telephone caller inquired about the veracity of the NOI's attempts on Malcolm X's life. Defendant Ali replied, "they were trying to kill Malcolm X and that he should be killed."

161.    The *New York Herald Tribune*, dated June 16, 1964, contained an article captioned "Eight Guards, Thirty-two Police for Malcolm X." The article stated that police officers were providing security for Malcolm X because of anonymous telephone tips that he would be shot if he appeared in court for the eviction trial concerning the NOI house he lived in, and from which the NOI was seeking to evict him.

162.    The June 18, 1964, *New York World Telegram and Sun* contained an article captioned "Malcolm X Man Marked for Death." This article stated in part that "police fear that Malcolm X is a marked man. The former East Coast leader of the Black Muslims goes nowhere without police shadows and his own core of rifle-bearing bodyguards. His own adherents insist he

is targeted for assassination by June 29."

163.    At 11:37 p.m. on July 3, 1964, Malcolm X called the NYPD to report that "two Black Muslims were waiting at his home to harm him. . . . But he sped off when they approached his car." Malcolm X knew the suspects' names and provided them to the police.

164.    In response, the NYPD placed an officer outside Malcolm X's home until 4:00 p.m. July 4, 1964. Despite the NYPD's response to Malcolm X's call, the NYPD and the FBI claimed it was simply a publicity stunt on behalf of Malcolm X.

165.    On July 7, 1964, the FBI New York Special Agent in Charge ("FBI NY-SAC") sent a memorandum to Defendant Hoover stating that "[o]n 7/5/64, subject was in contact with [BUREAU DELETION] told him that orders to kill him (Malcolm X) came from Chicago." The Federal Defendants, at the very least, had knowledge of the threat.

166.    One of Malcolm X's own NOI members, Captain Joseph X Gravitts, told an assistant to wire Malcolm X's car to explode when he started the engine. The man refused and informed Malcolm X of the plot.

167.    In response, Malcolm X said he "went few places without constant awareness that any number of my former brothers felt they would make heroes of themselves in the Nation of Islam if they killed me."

168.    In Chicago, NOI Captain Raymond Sharrieff threatened Malcolm X if he continued to talk about Elijah Muhammad.

169.    Death threats to Malcolm X's life continued throughout June and July of 1964 until he left for Africa.

170.    On July 9, 1964, Defendant Ali said on a Chicago call-in radio program: "Malcolm X probably fears for his safety because he is the one who opposes the Honorable Elijah Muhammad

... There were people who hated Kennedy so much that they assassinated him—white people. And there were white people who loved him so much they would have killed for him. You will find the same thing true of the Honorable Elijah Muhammad ... I predict that anyone who opposes the Honorable Elijah Muhammad puts their life in jeopardy."

171.    "[BUREAU REDACTED] advised that police were sent to guard Malcolm X who was appearing on a radio program, Station WEEI at 182 Tremont Street, Boston, Massachusetts from 2:10 P.M. until 5:00 P.M. and at 10:00 P.M. the same date Malcolm X was to appear on Radio Station WMEX, Boston."

172.    Malcolm X contacted the NYPD on July 7, 1964, and advised them that an attempt had been made on his life that day. Malcolm X provided notice to the defendants that he was at high risk of assassination. A couple of days before Malcolm X contacted the NYPD, the FBI was already aware of a plot on Malcolm X's life in Chicago.

173.    On July 10, 1964, a CIA informant stated that Malcolm X was "transporting material dealing with the ill treatment of the Negro in the United States. He intends to make such material available to the OAU in an effort to embarrass the United States."

174.    A *New York Times* article revealed on August 13, 1964, "The State Department and the Justice Department have begun to take an interest in Malcolm X's campaign to convince African states to raise the question of persecution of American Negroes at the United Nations."

175.    After the FBI received information that the NOI had ordered the death of Malcolm X, he left on another trip to Africa. The FBI monitored and tracked his movements across the African continent. On his journey, Malcolm X continued to speak about bringing the issues of racism to an international audience.

176.    On or about December 3, 1964, Malcolm X was a guest in a debate hosted by Eric

Abrahams, president of the Oxford Union at the University of Oxford. That evening, Tariq Ali ("Ali"), an internationally known political activist and writer, met with Malcolm X. After discussing various topics, Ali expressed that he hoped they would meet again. Malcolm X responded, "they're going to kill me soon. Either the FBI or the Nation of Islam or a combination of both because I am now too dangerous for them."

177.    Despite all the government surveillance, the public death threats, and the actual attempts on Malcolm X's life, Defendants Hoover, Sullivan, Ali, and their FBI and BOSSI co-conspirators the FBI did nothing to prevent the assassination; instead, they continued to encourage it.

178.    On February 9, 1965, 12 days before his assassination, Malcolm X traveled to France. Previously, he traveled and delivered speeches in France with no official resistance. However, this time, France refused to permit Malcolm X to enter the country for no apparent reason.

179.    Shortly after Malcolm X's assassination, journalist Eric Norden said he had spoken with a North African Diplomat about Malcolm X's trip to France.  Norden stated that the Diplomat revealed that he "had been quietly informed by the French Department of Alien Documentation and Counter-Espionage that the CIA planned Malcolm's murder, and France feared he might be liquidated on its soil."  The Diplomat added "your CIA is beginning to murder its own citizens now." This is direct evidence of the CIA's involvement in Malcolm X's murder.

**The Assassination is Imminent and the Defendants Knew It**

180.    On February 14, 1965, around 2:45 a.m., one week before his assassination, allegedly unknown individual(s) firebombed Malcolm X's home in the middle of the night. Fortunately, his pregnant wife, Mrs. Betty Shabazz, and their four young daughters escaped

unharmed.

181.    Malcolm X stated, "The attempt was made upon my life because I speak my mind and I know too much, and they know that I will speak it."

### The City of New York Defendants and the Federal Defendants Knew of Knowingly Facilitated the Assassination of Malcolm X

182.    On February 16, 1965, two of Malcolm X's bodyguards were arrested by the NYPD for allegedly plotting to blow up the Statue of Liberty at the encouragement and instigations of Defendant BOSSI undercover agent Ray Wood.

183.    These arrests were coordinated by the BOSSI defendants and the Federal Defendants to weaken Malcolm X's security, which knowingly facilitated his assassination.

184.    Upon his return from his unsuccessful trip to France, Malcolm X called his friend and biographer, the author Alex Haley ("Haley"), on Tuesday, February 16, 1965. Malcolm X informed Haley in the conversation, "I have been marked for death in the next five days. I have the names of five Black Muslims who have been chosen to kill me. I will announce them at the meeting." Malcolm X also told a friend that he would apply to the police department for a pistol permit.

185.    On Friday, February 19, 1965, Malcolm X had an appointment with Gordon Parks ("Parks"), a Life magazine photographer and author. Parks asked Malcolm X if it was true that killers were after him. "It's as true as we are standing here," Malcolm X said, "[t]hey've tried it twice in the last two weeks."

186.    Malcolm X told Parks, "I'm going to tell you something, brother—the more I keep thinking about this thing, the things that have been happening lately, I'm not all that sure it's the Muslims. I know what they can do, and what they can't, and they can't do some of the stuff recently going on. Now, I'm going to tell you, the more I keep thinking about what happened to me in

France, I think I'm going to quit saying it's the Muslims."

187.    Before his February 21, 1965, speech at the Audubon Ballroom, Malcolm X checked into the New York Hilton Hotel between 53rd and 54th streets at Rockefeller Center under the alias M. Khalil.

188.    During his stay at the hotel, unidentified individuals arrived demanding to know Malcolm X's room number. The Hotel staff repeatedly refused to provide the information. For the remainder of his stay in the hotel, hotel security maintained constant security on Malcolm X's floor.

189.    Malcolm X concluded his Thursday afternoon press conference by stating, "The police in this country know what is going on—this conspiracy leads to my death."

**The Assassination of Malcolm X**

190.    On the morning of February 21, 1965, Malcolm X awoke in his hotel room at the New York Hilton Hotel in Manhattan.

191.    Malcolm X spoke on the phone with his sister, Ella, and requested, "pray for me, Ella, because I firmly believe now I need it more than I've ever needed it before… So you ask Allah to guide me, because I feel they may have me doomed for this day."

192.    In the afternoon of February 21, 1965, Malcolm X held a speaking engagement at the Audubon Ballroom located at 3940 Broadway at West 165th Street in New York City.

193.     OAAU security did not search people at the door who entered the Audubon Ballroom. This was contrary to its common practice in past events featuring Malcolm X.

194.    The NYPD affirmatively changed their practice of being visibly present inside the Ballroom where Malcolm X spoke. Instead, the NYPD intentionally concealed their identities from the attendees, the Shabazz family, and Malcolm X.

195.    Around 3:02 p.m., Malcolm X approached the podium onstage to address approximately 400 people.

196.    Co-conspirators Benjamin Thomas, a former Assistant Secretary of NOI Mosque No. 76 in Paterson, New Jersey, and Wilbur McKinley, a former member of NOI Mosque No. 25 in Newark, New Jersey, coordinated a distraction in the audience by pretending to fight over a pickpocketing attempt.

197.    As Malcolm X began his speech, someone yelled, "get your hands out of my pocket!"

198.    Malcolm X directed his bodyguards to the audience to quell the situation.

199.    McKinley then threw a smoke bomb onto the Audubon Ballroom floor to create a further diversion.

200.    Around 3:10 p.m., Co-Conspirator William Bradley, also known as Al-Mustafa Shabazz, a former Lieutenant in the Newark NOI, shot Malcolm X in the chest with a sawed-off, 12-gauge JC Higgins brand shotgun.

201.    Two former members of the NOI from Paterson, New Jersey—Co-Conspirators Talmadge Hayer, also known as Thomas Hagan, armed with a .45 caliber automatic pistol, and Leon Davis, who fired a 9-millimeter automatic pistol—shot Malcolm X repeatedly as he lay wounded and bleeding on the stage.

202.    Bullets riddled the walls behind the stage and the podium where Malcolm X was first shot.

203.    Patrolman Thomas Hoy was stationed outside the Audubon Ballroom entrance. He rushed inside and saw Malcolm X lying on the stage and some people chasing a man. Patrolman Hoy "grabbed the suspect."

204.    Sergeant Alvin Aronoff and Patrolman Louis Angelos happened to be cruising by in their radio car when they heard shots. When they arrived, a crowd formed with people frantically pushing and screaming that Malcolm X was shot. The two officers grabbed the arms of an individual, later identified as Thomas Hagan, and took him to the police station.

205.    Malcolm X's pregnant wife and four daughters huddled together in the front row, taking cover as they witnessed the horror of their husband and father gunned down mere feet away.

206.    Supporters of Malcolm X from the crowd used a stretcher to transport him to Columbia Presbyterian Medical Center across the street. Efforts to revive Malcolm X were unsuccessful.



10

---

[10] Stanley Wolfson, Photograph of the bullet holes in the back of the stage where Malcolm X was shot, *in* New York World-Telegram and the Sun.



11

207.    Malcolm X was hit by eight shotgun slugs and nine bullets from .45 caliber and 9-millimeter guns. The evidence indicated he was hit by the shotgun slugs while standing and by bullets from the other weapons while prone.



12

---

[11] WCBS-TV, Photograph of Malcolm X being tended to after being shot, *in* The Associated Press (Feb. 21, 1965).
[12] Stanley Wolfson, Photograph of where Malcolm X was standing when assassins struck, *in* New York World-Telegram and the Sun.

208.    Doctors declared Malcolm X dead at 3:30 p.m. on February 21, 1965. He was 39 years old.

209.    A week before Malcolm X's assassination, the NYPD, despite knowing otherwise, publicly claimed that the previous attempts on Malcolm X's life were publicity stunts orchestrated by himself. "The guy had a bad sheet," as one headquarters officer put it to author Peter Goldman, "You don't offer somebody like that protection."

210.    Numerous associates of Malcolm X revealed in the week leading up to Malcolm X's assassination, he repeatedly complained that the NYPD would not respond to his requests for protection. Moreover, Malcolm X requested a firearm permit for protection that was never approved.

211.    Malcolm X had previously accepted police protection. For instance, on a trip to Los Angeles, California, in January 1965, the Los Angeles Police Department provided him with protection. And a month later, in February 1965, the Chicago Police Department protected him from the NOI for the three days he was in the city.

212.    Instead of ensuring Malcolm X's protection, the FBI and BOSSI Defendants actively worked to ensure Malcolm X's vulnerability by reducing his hired protection.

213.    On his deathbed in 2021, BOSSI Defendant WOOD explained in a letter that his BOSSI supervisors directed him to implicate two of Malcolm X's bodyguards in an alleged plot to blow up the Statue of Liberty.

214.    The plan was executed on February 16, 1965, and the two bodyguards were arrested, leaving them unavailable to protect Malcolm X on the day of his assassination.

215.    A February 22, 1965 memorandum from the New York FBI to Defendant Hoover stated: "[BUREAU REDACTED] overheard [BUREAU REDACTED] reporter 'Life' magazine,

in conversation with a [redacted] Washington, D.C., approximately eleven thirty pm February twenty-one sixty-five during which conversation [BUREAU REDACTED] stated that the killers of Malcolm X were possibly imported to N.Y.C. [BUREAU REDACTED] believed the following statements by [BUREAU REDACTED] to be accurate. That [BUREAU REDACTED] advised [BUREAU REDACTED] to check out Washington and C.I.A. because they wanted Malcolm out of the way because he 'snafued' African relations for the U.S."

216.    The defendants affirmatively encouraged, coordinated, and provided the circumstances for the successful assassination of Malcolm X.

**The Cover-up and Denial of Access to the Courts**



217.    The NYPD and FBI Defendants jointly investigated the murder of Malcolm X.

218.    Among the NYPD Case Detectives, the lead detectives assigned to the case were Defendants Cavallaro, Confrey, Conroy, Cusmano, Iacovelli, Keeley, Rushin, and Schaetzle, along with their supervisors, Defendants Cilento, Garelik, Renaghan, Robb, and Sullivan

(collectively, the "Lead Detectives").

219.    Defendants De Vergee, Taylor, Twomey, Vohs, and Willis (collectively, the "Assisting Detectives") assisted with the investigation, including the custody, transport, interrogation, and preparation of witnesses and potential witnesses to give statements and/or take part in identification procedures.

220.    The FBI, CIA, NYPD, and BOSSI, through the FBI and BOSSI Defendants and their co-conspirators, infiltrated Malcolm X's organization and established a liaison system of higher-ranking officers to exchange information.

221.    The FBI Defendants provided the NYPD Defendants with the identities of individuals believed to be present in the Audubon Ballroom at the time of the murder. NYPD Defendants from BOSSI also participated in certain interviews with FBI agents. Both the NYPD and FBI Defendants, at each other's request, conducted research and shared information about persons of interest, including at least three of the five actual assassins.

222.    The NYPD and FBI, including, but not limited to, both the named and, as of yet unidentified, NYPD and FBI Defendants, worked closely together throughout the investigation and prosecution of the case, and there was extensive cooperation and sharing of information.

223.    For example, it was recently revealed that at least ten eyewitnesses, both testifying and non-testifying, were FBI informants in the Audubon Ballroom the day Malcolm X was assassinated and sent to the NYPD by their FBI contacts. The FBI coordinated these informants' cooperation with the NYPD.

224.    From then until now, the FBI and NYPD Defendants and their co-conspirators have suppressed the identities of these FBI informants, as well as other FBI and BOSSI informants reporting on Malcolm X, his organization, and/or the NOI and its leadership in New York, New

48

Jersey, Chicago, and Washington, DC.

225.    In the NYPD Case, Defendant-Detectives were under immense pressure from their superiors and others to arrest and charge at least two persons with the murder of Malcolm X and to do so quickly.

226.    The Lead Defendant Detectives employed identification procedures they knew were improper and created a substantial risk of causing a false identification.

227.    The Assisting Defendant Detectives witnessed the foregoing, frequently failing to document the misconduct and, in all cases, failing to cause the disclosure of the misconduct.

228.    A BOSSI Lieutenant, Defendant Bouza, admitted in 2011, "The investigation was botched."

### Witnesses Manipulated by the NYPD Defendants

229.    Each of the Defendant Lead Detectives was aware of the police misconduct related to the eyewitnesses described herein, except for information concealed by the BOSSI and FBI Defendants and their co-conspirators.

230.    Twelve eyewitnesses testified for the prosecution at the 1966 criminal trial of Talmadge Hayer (AKA Thomas Hagan), Muhammad Aziz (AKA Norman 3x Butler), and Khalil Islam (AKA Thomas 15 X Johnson)—the three men who were arrested and prosecuted for assassinating Malcolm X—that they were present in the Audubon Ballroom at the time Malcolm X was shot.

231.    The eyewitnesses were Cary Thomas, Vernal Temple, Edward DePina, George Whitney, Jasper Davis, John Davis, Ronald Timberlake, Fred Williams, Charles Blackwell, Roland Wallace, and Charles Moore.

232.    Neither the FBI nor the NYPD Defendants have, to this day, revealed whether any

of these witnesses, except for Defendant Timberlake, were before, during, or after the assassination, informants for, or agents of, BOSSI, the NYPD, the FBI, or any other law enforcement agencies.

233.    In an effort to shield the involvement of the NYPD, FBI, and BOSSI Defendants— witness Cary Thomas ("Thomas"), one of Malcolm X's bodyguards, was arrested and held on a $50,000 bond. NYPD Defendants Cavallaro, Cilento, Conroy, Cusmano, De Vergee, Keeley, Schaetzle, and Twomey, acting individually and in concert with one another, the investigating FBI Defendants and others not named herein, repeatedly met with Thomas.

234.    They provided Thomas with the identity of the alleged perpetrators of the shooting of Malcolm X; threatened him; promised to assist him with criminal and civil matters in return for his cooperation; provided him with money, shopping trips, and other benefits in return for his cooperation; caused him to be detained pursuant to a material witness order; repeatedly removed him from custody to curry favor with him and ensure his cooperation; showed him photographs of specific individuals prior to identification procedures and/or to trial.

235.    Thomas subsequently provided different stories to the grand jury and at trial. Additionally, the judge refused to allow evidence of Thomas' documented psychiatric and substance abuse history at the 1966 trial.

236.    NYPD Defendants Cavallaro, Cilento, Conroy, Keeley, Twomey, and Vohs, acting individually and in concert with one another, the investigating FBI Defendants, and others not named herein, met repeatedly with witnesses Vernal Temple, Edward DePina, Jasper Davis, Charles Blackwell, and Fred Williams; urged them on whom to identify as perpetrators in the shooting of Malcolm X.

237.    They also threatened them, showed them photographs of specific individuals prior

50

to identification procedures and/or to trial, fed them false facts to recite in testimony, and prepared them to provide false identifications, including before the grand jury and at the 1966 trial.

238.    NYPD, Defendants Cavallaro, Cilento, Conroy, Iacovelli, Keeley, and Sullivan, acting individually and in concert with one another, the investigating FBI Defendants, and others not named herein, repeatedly met with Defendant Ronald Timberlake ("Timberlake"), who illegally took one of the murder weapons from the crime scene before contacting the FBI.

239.    Timberlake was urged by these Defendants whom to identify as the perpetrators in the shooting of Malcolm X. Timberlake was offered monetary and other benefits in return for his cooperation; they promised to assist him with criminal and civil matters in return for his cooperation and threatened him; showed him photographs of specific individuals before identification procedures and/or to trial; fed him false facts to recite in testimony; and prepared him to provide false identifications, including before the grand jury and at trial.

240.    NYPD Defendants Cavallaro, Cilento, Cusmano, Keeley, and Twomey, acting individually and in concert with one another, the investigating FBI Defendants, and others not named herein, repeatedly met with witness Benjamin Karim, also known as Benjamin 2X and Benjamin Goodman, who preceded Malcolm X as a speaker at the Audubon Ballroom on the day of the assassination, whereby the information was only shared with Defendants Cilento, Garelik, Renaghan, Robb, and amongst others.

241.    NYPD Defendant Cilento, acting individually and in concert with the investigating FBI Defendants and others not named herein, met one or more times with witness Earl Grant ("Grant"), whereby he received information, including, but not limited to, the account of a percipient witness who recognized several persons involved in the murder of Malcolm X, including Benjamin Thomas, which he only shared with Defendants Cavallaro, Cilento, Keeley,

Garelik, Renaghan, Robb, and among others.

242.    At the 1966 criminal trial, Grant detailed the delayed response of the police officers present and their nonchalance to the severe nature of the moment. Grant stated, "I could hardly believe my eyes. Here were New York City policemen, entering a room from which at least a dozen shots had been heard, and yet not one of them had his gun out! As a matter of absolute fact, some of them even had their hands in their pockets." This is more evidence the NYPD Defendants knew of the assassination.

243.    NYPD Defendants De Vergee, Taylor, Twomey, Vohs, and Willis communicated the exculpatory information they became aware of during the investigation to Defendants Cavallaro, Confrey, Conroy, Cusmano, Iacovelli, Keeley, Rushin, and Schaetzle, who in turn communicated that information to Defendants Cilento, Garelik, Renaghan, Robb, and Francis Sullivan.

244.    Defendants Cavallaro, Cilento, Conroy, Keeley, Twomey, and Vohs, acting individually and in concert with one another, the investigating FBI Defendants, and others not named herein, repeatedly met with witness and Malcolm X's bodyguard, Charles Blackwell ("Blackwell"). They urged Blackwell on whom to identify as perpetrators in the shooting of Malcolm X; threatened him; showed him photographs of specific individuals before identification procedures and/or to trial; fed him false facts to recite in testimony; and prepared him to provide false identifications, including before the grand jury and at trial.

245.    During the grand jury hearing on March 9, 1965, Blackwell identified three men as the individuals who shot and killed Malcolm X. However, during his testimony at the 1966 trial, he only identified one individual. When asked about the discrepancies, Blackwell stated that he lied in front of the grand jury because he was ashamed that he left his post on the day of the

assassination.

246.    NYPD files unearthed in the DANY investigation and publicly revealed only in November of 2021 included information about a call to a *New York Daily News* reporter on the morning of the shooting indicating that Malcolm X was going to be killed, yet no uniformed officers were present at the event.

247.    At the 1966 trial, NYPD Police Officer Gilbert Henry ("Henry") testified about what he observed the day Malcolm X was murdered. Henry stated that he and his partner, John Carroll, were assigned to be outside the Audubon Ballroom that day. Henry explained the unusual instructions his superior officer, Sergeant Devaney, gave him.

248.    Sergeant Devaney told Henry and his partner to "remain where [they] would not be seen." If anything occurred, Henry should use the walkie-talkie provided to him. At the other end of the walkie-talkie was another police officer stationed at the Presbyterian Medical Center, the same hospital Malcolm X would be taken to after he was shot. After the shooting started, Henry attempted to use the walkie-talkie to call for backup but received no response. When Henry arrived at the crime scene, all the suspects were gone.

249.    The FBI, NYPD, and BOSSI Defendants, both named and as of yet unidentified, made sure that police officers were nearby but not present in the Audubon Ballroom to ensure that they did not impede the murderers from slaying Malcolm X.

### Identified Undercover Agents, Informants, and Informant-Provocateurs

#### *Defendant Eugene Roberts*

250.    On April 17, 1964, four days after Malcolm X left New York for his pilgrimage to Mecca, BOSSI Defendants Ulasewicz and Theologes sent their newly sworn-in, twenty-five-year-old, Black detective, Defendant Eugene "Gene" Roberts, to infiltrate Muslim Mosque, Inc.

("MMI")

251.    Roberts joined the MMI security team and, as one of Malcolm X's bodyguards. Roberts reported all of the MMI and OAAU's major decisions and plans to the NYPD.

252.    Defendant Roberts decades later recalled that on the evening of Monday, February 15, 1965, Malcolm X held a speaking engagement at the Audubon Ballroom, the same room he would be assassinated in six days later.  Defendant Roberts was at the time posing as a security guard for Malcolm X while secretly working as an undercover officer for the BOSSI unit of the NYPD.

253.    Defendant Roberts explained that there was a noise in the audience. Then, an unknown individual walked down the aisle. Defendant Roberts moved towards the individual, and the individual abruptly sat down.

254.    Defendant Roberts believed he had witnessed a dry run of Malcolm X's assassination and reported this to his department after the meeting.

255.    Defendant Roberts' department called his supervisor, Defendant Theologes, the next day and expressed, "[Roberts] felt like it was going to happen at the meeting [scheduled for the Audubon Ballroom] the following Sunday. [Roberts] told them if it's going to happen, it's going to go down Sunday."

256.    Defendant Roberts then called his other supervisor, Defendant Ulasewicz, at a later date and once again explained what he witnessed.  However, his Defendant-supervisors' simple response was, "okay, we'll pass it on" and "we'll take care of it." This information was part of the defendants' knowledge and resulted in the arrest of members of Malcolm X's security detail.

257.    On the evening of February 15, 1965, in his final speech before his assassination, Malcolm X stated, "Don't you think that anything is going down that [the police] don't know

about. The only thing that goes down is what they want to go down, and what they don't want to go down they don't let go down."

258.    Numerous NYPD, BOSSI, and FBI informants and undercover officers, almost all of whom remain unidentified to this day, witnessed the murder of Malcolm X, including Defendant Roberts, who was continuing to pose as a security guard for Malcolm X while also continuing his clandestine work as an undercover officer for the BOSSI unit of the NYPD.

259.    As a member of the rostrum security team on the day of Malcolm X's murder, Defendant Roberts observed two of the shooters seated in the front row of the Audubon Ballroom and saw the three shooters run in the same direction toward the back of the Audubon Ballroom. Two shooters ran past Defendant Roberts, and Defendant Roberts physically engaged the third.

260.    Defendant Roberts's identity as an undercover NYPD officer and the revelation that he witnessed Malcolm X's murder was not made public until he testified in 1970 in the Black Panther 21 case.

261.    When questioned about Malcolm X's murder at the 1970 trial, Defendant Roberts testified that he was working undercover as a member of Malcolm's "rostrum security" and "[a]t the end of Benjamin Goodman's speech, the rostrum security was relieved…. So [he] proceeded to the back where [he] met the security captain who told [them] to just sit around and in a half hour [they] would be on post again."

262.    Defendant Roberts testified in 1970 that "two individuals near the front of the auditorium jumped up" to create the distraction. As Defendant Roberts "started down the aisle" toward them, gunfire erupted. Defendant Roberts testified that he came face to face with Talmadge Hayer ("Hayer")—one of Malcolm X's assassins—who shot at him but missed and that he hit Hayer with a chair, knocking him down.

263.    Defendant Roberts reported his observations to the BOSSI Defendants, but they decided not to reveal the information to anyone outside their covert unit.

264.    Instead, pursuant to the NYPD's policies and established practices at the time, Defendant Roberts's identity and the intelligence he generated were strictly compartmentalized – kept secret even within the NYPD. As a result, neither the prosecution, the Court, the defense, nor the public knew that Defendant Roberts was a BOSSI undercover agent until he was revealed as a witness in 1970.

265.    In an interview decades later, Defendant Roberts revealed that in the days following the assassination, he was chastised by his BOSSI handlers, including Defendants Theologes and Bouza, for giving Malcolm X mouth-to-mouth resuscitation after he was shot. This is further evidence that employees of BOSSI wanted Malcolm X dead.

### *Defendant John Ali*

266.    Defendant John "X" Ali Simmons ("Ali") was reportedly a former FBI informant-provocateur working under Defendants Hoover and Sullivan. Ali was national secretary of the NOI, which he reportedly infiltrated on orders from the FBI with the knowledge and approval of Defendants Hoover and Sullivan.

267.    Ali and Malcolm X were friends early in their membership in the NOI. They were also roommates for a time; Malcolm X and his wife shared a house with Defendant Ali and his wife.

268.    Defendant Ali replaced Ernest T. 2X McGhee as the National Secretary of the NOI. In terms of hierarchy within the NOI, this made FBI Defendant Ali second only to Elijah Muhammad.

269.    In this highly influential position, Ali was in charge of the NOI's banking

institution, and all confidential communications between the NOI Chicago headquarters and other Mosques passed through Defendant Ali's office first.

270.    Defendant Ali also informed Elijah Muhammad directly of Malcolm X's comments regarding JFK's assassination, which caused Malcolm X to be suspended from the NOI. Malcolm X blamed Defendant Ali for his suspension.

271.    In January 1965, on a trip to Los Angeles, California, the Los Angeles Police Department provided Malcolm X protection when NOI members, including Defendant Ali, awaited Malcolm X's arrival at the airport, even though his trip was supposed to be a secret. Only seven people were aware of his trip.

272.    Defendant Ali was also publicly vocal about what he believed should happen with Malcolm X, repeatedly calling for his death.

273.    On February 20, 1965, the day before Malcolm X's murder, Defendant Ali was witnessed with Hayer in the Americana Inn's restaurant in New York.

274.    Defendant Ali arrived from Chicago on February 19, 1965, checked into a hotel in Manhattan, and checked out on the evening of February 21, 1965.

275.    The FBI Defendants have withheld, and the FBI continues to withhold, Defendant Ali's informant-provocateur status, and the FBI also continues to this day to suppress the identity of his FBI handlers, his connection to COINTELPRO, his role in the assassination of Malcolm X, and the subsequent cover-up of that role.

### Defendant Raymond A. Wood

276.    Significantly, in 2021, the family of BOSSI Defendant Raymond Wood made public a letter he typed before his death.

277.    The NYPD hired Defendant Wood on April 17, 1964, and assigned him to the

BOSSI unit.

278.    In the letter, Defendant Wood stated his job was "to infiltrate civil rights organizations throughout New York City, to find evidence of criminal activity, so the FBI could discredit and arrest its leaders." Following the direction of his handlers, he was instructed to "encourage leaders and members of civil rights groups to commit felonious acts."

279.    At one point, Defendant Wood attempted to resign, but the NYPD threatened trumped-up charges against him.

280.    In this letter, Defendant Wood also discussed an alleged plot to blow up the Statue of Liberty.

281.    Defendant Wood explained that his BOSSI supervisors planned to implicate two of Malcolm X's bodyguards in the plot. BOSSI defendants did this to make sure they were unable to provide security for Malcolm X on the day of his murder.

282.    Defendant Wood was sent to the Audubon Ballroom on the day of the assassination. He further stated that he "was identified by witnesses while leaving the scene [and] Thomas Johnson [Khalil Islam] was later arrested and wrongfully convicted to protect [Wood's] cover and the secrets of the FBI and NYPD."

283.    On March 6, 1965, at an OAAU meeting, Japanese American activist Yuri Kochiyama, who was present at that meeting, scribbled on a small piece of paper: "Ray Woods is said to have been seen also running out of Audubon; was one of two picked up by police. Was the second person running out."

284.    The BOSSI and FBI Defendants concealed Wood's identity as an undercover BOSSI agent for decades, and BOSSI and the FBI continue to this day to suppress the identity of his BOSSI handlers, his and BOSSI's role in the Statue of Liberty frame-up, his role in the

assassination of Malcolm X and the subsequent cover-up of that role.

### Defendant Abdul Basit Naeem

285.    Abdul Basit Naeem ("Naeem") was a journalist residing in New York at all times relevant. Naeem was also an FBI informant and member of the NOI, working on Elijah Muhammad's public relations. Naeem also traveled abroad with Malcolm X on occasion.

286.    However, once Malcolm X left the NOI, Naeem's attacks on him began.

287.    Naeem was reportedly the FBI's "second reliable informant in the NOI's inner circle." He published several anti-Malcolm X articles just before Malcolm X's assassination, including his "Hypocrites Cannot Alter Muhammad's Divine Destiny."

288.    The FBI Defendants have withheld, and the FBI continues to withhold, Defendant Naeem's informant-provocateur status and the FBI also continues to this day to suppress the identity of his FBI handlers, his connection to COINTELPRO, his role in the assassination of Malcolm X, and the subsequent cover-up of that role.

289.    Other top-level NOI officials also cooperated with the FBI Defendants. They provided the FBI with information it considered crucial to inciting violence between Elijah Muhammad, the NOI, and Malcolm X. The FBI has withheld and continues to withhold these officials' identities, the information they supplied, and the actions they took.

290.    In or around 2020, Former FBI agent Defendant Arthur Fulton admitted that he was in charge of nine FBI informants in the Audubon Ballroom when the shooting started. Not one interceded to halt the events that unfolded, and, thanks to the continued concealment by Fulton, his FBI superiors, including Defendants Hoover and Sullivan, the identities, activities, and information supplied remain unknown.

**Subsequent Revelations in 1977-1978**

291.    Benjamin Goodman ("Goodman")—Malcolm X's assistant minister who spoke to the audience in the Audubon Ballroom immediately before Malcolm X on February 21, 1965—submitted an affidavit in 1978 supporting the innocence of Mr. Aziz ("Butler") and Mr. Islam ("Johnson"). Goodman discussed in his affidavit how the NYPD, including, on information and belief, one or more of the NYPD Defendants named herein, summoned him to the police station and questioned him about Mr. Aziz and Mr. Islam. Goodman repeatedly told the officers that the two men were not at the Audubon Ballroom on the day of the assassination. Goodman stated that the detectives became irate because he was not saying what they wanted to hear.

292.    Goodman was summoned again, at a later date, by Assistant District Attorney Herbert J. Stern ("Stern"). Goodman told Stern the following: "I knew Butler and Johnson, they had not been present at the [Audubon Ballroom] that day, and that I had not seen the actual shooting. When I said this, Mr. Stern became angry and said that he knew I had previously said that I had seen the shooting through an open dressing room door. This was not true and I had never said this to anyone. In his anger, Mr. Stern threatened me and asked me, have you ever been to jail? How would you like to go to jail?" Goodman was never called to testify in the 1966 murder trial.

293.    Robert Haggins ("Haggins") was a photographer for Malcolm X. Haggins was present in the Audubon Ballroom on the day of the assassination. Haggins recounted that he observed over two dozen police officers in the waiting room of the Audubon Ballroom. However, it was not until Malcolm X was shot that they came into the Audubon Ballroom area. Haggins was never called to testify in the 1966 murder trial.

294.    In Talmadge Hayer's affidavits dated November 30, 1977, and February 25, 1978,

Hayer identified his fellow assassins as Benjamin Thomas, Leon Davis, "William X" (whom he subsequently identified as William Bradley), and "Wilbur or Kinly" (Wilber McKinley).

295.    Hayer described the murder plot, his recruitment to the plot, the planning of the murder, and each assassin's role. Hayer explained that he and Davis sat in the front row of the Audubon Ballroom, with Bradley and Thomas sitting close behind them and McKinley in the rear.

296.    In December 1977, Mr. Aziz moved to vacate his conviction for the assassination of Malcolm X, primarily on the grounds of newly discovered evidence under C.P.L. Section 440.10(1)(g) (the "1977 440 Motion").

297.    In January 1978, Defendant Roberts provided a substantially false affidavit, submitted by DANY in the 1977 440 Motion, in which he falsely denied his or the NYPD's involvement in Malcolm X's assassination and averring that he did "not have any information" or reason to believe Mr. Aziz was innocent.

290.    Relying on this false affidavit and deprived of crucial evidence that was suppressed by the FBI and NYPD Defendants, Justice Harold Rothwax denied Mr. Aziz's 1977 440 Motion.

### November 18, 2021 Revelations

291    A nearly two-year investigation by the New York District Attorney's Office (the Conviction Integrity Reinvestigation)  and the Innocence Project uncovered FBI documents that revealed a description of the killers that did not match Mr. Aziz or Mr. Islam, an admission that the only witnesses who identified Mr. Aziz and Mr. Islam were FBI informants, and a report that said sources reviewed photos of Mr. Islam and failed to place him in the Audubon Ballroom where Malcolm X was assassinated on February 21, 1965.

292    Among the documents unearthed during this re-investigation were four FBI reports that summarize interviews with a witness to the murder who had been a federal informant and

testified at the trial, the DANY's Joint Motion of November 18, 2021, stated. It did not name the witness. The witness's name continues to be redacted.

298.    Other evidence contained in the November 18, 2021, Joint Motion, which corroborated key details of Hayer's 1966 testimony and 1977 and 1978 affidavits, was the crucial initial account of prosecution witness Charles Blackwell ("Blackwell"). This account, which contradicted Blackwell's later trial testimony, was memorialized in an NYPD report (the "Blackwell Report") that was uncovered during the Conviction Integrity Reinvestigation but hidden from the defense by the NYPD and FBI Defendants for more than 55 years, and from the public and the Plaintiffs until on or after November 18, 2021.

299.    The Blackwell Report provided a detailed description of events preceding Malcolm X's murder. Blackwell, a NOI Jersey City Mosque member, told an NYPD informant that he "was stationed on the left side of the rostrum looking at the stage." Blackwell saw "a fellow named Linwood from Plainfield[,] N.J.," who sat "in the front row on the right side." Meanwhile, "two other men who had entered with [Linwood] separate[d from him] and s[a]t on the left front row of chairs" – the precise location where Hayer said he and Davis sat. Blackwell reported that he felt the men were staring at him because they recognized him. He later heard the commotion in the audience, "and then the shooting started."

300.    The NYPD and FBI Defendants suppressed more information about Hayer's co-conspirators. For example, just three months after the murder, the NYPD Defendants discussed assassin William Bradley with the FBI and with FBI Defendant Micek, who was a liaison between the FBI and NYPD Defendant-investigators and ran searches on Bradley through BOSSI and the NYPD's Bureau of Criminal Identification.

301.    Among the additional crucial, newly discovered documents unearthed during the

re-investigation and first made public on or after November 18, 2021, include, but are not limited

to:

a.      an FBI report dated February 22, 1965, stating that "the killers of Malcolm X were possibly imported to NYC" and that the shooters sat in the front seats of the Audubon Ballroom, and providing detailed descriptions of two suspects;

b.      An FBI report dated February 25, 1965, indicating that, at then-Director J. Edgar Hoover's behest, local FBI offices were instructed not to disclose to the NYPD the FBI informant status of any witness in the murder investigation;

c.      An FBI report dated March 4, 1965, containing information about a known associate of Halim's nicknamed "Turk," noting, *inter alia*, that "Turk" was believed to be Leon Davis—the man now known to have shot Malcolm X with a 9 mm semiautomatic handgun, *i.e.*, the conduct attributed to Mr. Aziz in the criminal case;

d.      A police report dated March 8, 1965, with information from an eyewitness to the murder, describing the shooters as men from the Nation of Islam and based in New Jersey who sat in the front row on the left-hand side, with "Benjamin from Paterson or Newark" seated two rows behind them—precisely matching Hayer's description of himself, Leon Davis, and Benjamin Thomas;

e.      An FBI report dated March 25, 1965, summarizing intelligence that one of the shooters came from Newark, New Jersey;

f.      An FBI dossier on William Bradley, the shotgun wielding assassin whose shots killed Malcolm X, containing detailed information collected between 1963 and 1965, demonstrating clear links between Bradley and Malcolm X's murder;

g.      An April 13, 1965, memorandum from Defendant Hoover to the Special Agent in Charge of the New York Field Office, instructing that the FBI's intelligence implicating "a lieutenant from the Newark Temple of the Nation of Islam"—referring to Bradley—must "not be furnished to the [NYPD] without first receiving Bureau authority"; and

h.      Numerous reports from BOSSI Defendant Eugene Roberts corroborating Hayer's account of the murder and undermining the testimony of every prosecution witness.

302.    The FBI and NYPD Defendants hid yet more information about the assassins of

Malcolm X. For example, the FBI had, within a day of the murder, a detailed physical description of the shotgun assailant, who was described as "a negro male, age twenty-eight, six feet two inches, two hundred pounds, heavy build, dark complexion, wearing [a] gray coat and believed to be [the] assailant who used [the] shotgun." This description accurately described William Bradley.

303.    The same Boston-based informant who provided intelligence about the assailants' connections to New Jersey also reported to the FBI that the shotgun assailant was "a tall, dark skinned" Black man recognized as "a lieutenant in the Newark Temple" who "shot from the hip and appeared to be an expert in the handling of this type of gun."

304.    Numerous FBI employees, including the FBI Defendants, were aware of the match between these descriptions of the shotgun assailant and Bradley, given that the FBI had been investigating Bradley for years and had compiled a detailed dossier on him.

305.    FBI Defendant Dale Sutton had prepared the FBI file on Bradley between 1963 and 1965, which described Bradley as a Black man, twenty-seven years old at the time of the murder, 5'10" tall, 197 pounds, "stocky," with a "dark brown" complexion. It also stated, that: (1) he had been a lieutenant in the Newark Mosque, (2) he was known as a "strong-arm" man for the NOI, (3) he had a history of violence, and (4) he was a former Marine trained in firearms. The file also noted that the FBI possessed photographs of Bradley.

306.    The newly revealed evidence also demonstrates a significant ongoing relationship between Bradley and the FBI, including those four years after the murder of Malcolm X, Bradley was arrested for participating in an armed robbery of Livingston National Bank in Livingston, New Jersey. Bradley was armed with a shotgun during the robbery. Bradley and a co-defendant were charged in the United States District Court for the District of New Jersey in a case prosecuted by the DOJ.

307.     When Bradley appeared in court for his plea hearing, he passed a note to the judge, who then reduced his bail from $25,000 to $10,000. Bradley posted bail and was released from custody with no restrictions on his pre-trial release. The court remanded Bradley's co-defendant and denied the co-defendant's later motion to set bail.

308.     Bradley's co-defendant went to trial, was convicted, and sentenced to 25 years in prison.

309.     The DOJ moved to dismiss the charges against Bradley, and the court granted the motion.

310.     Former Manhattan District Attorney Cyrus Vance ("Vance") moved to vacate Mr. Aziz's and Mr. Islam's convictions on November 18, 2021.

311.     Vance also criticized how law enforcement handled the case, stating that through the investigation, "[m]ost critically, we have obtained dozens and dozens of reports, from the FBI and the NYPD's Bureau of Special Services and Investigations [BOSSI] .… And, significantly, we now have reports revealing that, on orders from Director J. Edgar Hoover himself, the FBI ordered multiple witnesses not to tell police or prosecutors that they were, in fact, FBI informants."

312.     The extent of the NYPD, BOSSI, and FBI and their Defendant-Agents' suppression of information that further evidences the NYPD and FBI Defendants' and their co-conspirators' involvement in the assassination of Malcolm X, the cover-up of their roles and the involvement of their agents and informants, still has not been revealed by the NYPD, the FBI, or DANY.

## Additional New Revelations

### *The Revelations of Walter Bowe*

313.     Walter Bowe ("Mr. Bowe") was a charter member of the OAAU.

314.     On October 23, 2023, Mr. Bowe revealed for the first time in a sworn affidavit that

on or about January 19, 1965, he was approached by Defendant Wood, who, unbeknownst to Mr. Bowe, was an undercover NYPD BOSSI officer.

315.    During that time, Defendant Wood manipulated Mr. Bowe to appear to be part of a conspiracy to destroy the Statute of Liberty.

316.    On February 16, 1965, Mr. Bowe was detained and arrested by the NYPD related to the conspiracy manufactured by Defendant Wood.

317.    Due to his arrest and detainment, Mr. Bowe was not present at the Audubon Ballroom on February 21, 1965, and could not assist with Malcolm X's security detail, which would have been his normal role at his public engagements.

### The Revelations of Khaleel Sayyed

318.    Khaleel Sayyed ("Mr. Sayyed") was affiliated with the OAAU in 1964 and 1965.

319.    On January 24, 2024, Mr. Sayyed revealed for the first time in a sworn affidavit that he was introduced to Defendant Raymond Wood on or about January 1965. Unbeknownst to Mr. Sayyed, Wood was an undercover NYPD BOSSI officer.

320.    Defendant Wood raised the idea of destroying the Statue of Liberty. When Wood mentioned this idea, everyone laughed, and Mr. Sayyed did not think Wood was serious.

321.    Mr. Sayyed was part of a small group of people who were asked to serve as security at Malcolm X's home after it was firebombed on February 14, 1965.

322.    On or about February 16, 1965, Mr. Sayyed was arrested and detained by the NYPD related to the conspiracy to blow up the Statue of Liberty manufactured by Defendant Wood.

323.    Had he not been arrested, he would have attended Malcolm X's speech at the Audubon Ballroom and could have served as part of his security detail.

### *The Revelations of Mustafa Hassan*

324.    Mustafa Hassan ("Mr. Hassan") was a member of the OAAU in 1964 and 1965.

325.    On June 6, 2023, Mr. Hassan revealed for the first time in a sworn affidavit that on February 21, 1965, he assisted with the security detail at the Audubon Ballroom when Malcolm X delivered his speech.

326.    After gunshots rang out, Mr. Hassan ran from his post at the entrance of the ballroom and witnessed Malcolm X being shot. As Mr. Hassan made his way toward the stage, he saw a man who he now knows to be Talmadge Hayer running down the aisle towards the exit with a gun in his hand.

327.    Mr. Hassan later saw Hayer outside the ballroom as Hayer was being beaten by Malcolm X's followers and heard police, who had suddenly shown up, asking, in reference to Hayer, "Is he with us?" while at the same time holding back Malcolm X's followers from beating Hayer.

328.    Mr. Hassan believed the police were trying to help Hayer escape, so he reached out and grabbed Hayer by his collar to prevent him from escaping.

### *The Death of Leon Ameer*

329.    Shortly after Malcolm X's assassination, Defendants Cavallaro, Cusmano, Conroy, Cilento, De Vergee, Keeley, Schaetzle, and Twomey, acting individually and in concert with one another, the investigating FBI Defendants, and others not named herein, repeatedly met with witness Leon Ameer ("Ameer"), also known as Leon 4X and Leon Phillips, Jr., the head of the Boston OAAU.

330.    Through intimidating Ameer, these Defendants received information, including, but not limited to, a description of one or more perpetrators of the assassination and information

about the involvement of the Newark, New Jersey Mosque, which they shared with Defendants Cilento, Garelik, Renaghan, Robb, and among others.

331.    On March 13, 1965, Ameer stated in a speech that he had "facts in [his] possession as to who really killed Malcolm X" and that "this is probably the last time [we'd see him] alive."

332.    Ameer was found dead under mysterious circumstances mere hours later.

## The Systemic Corruption of the NYPD and BOSSI

333.    Before, at the time of, and after Malcolm X's assassination, the Defendant City's Police Department was plagued by institutional deficiencies and corruption that the City allowed to fester and worsen until it was a gaping wound visible to even the most apolitical individuals. The City cultivated and permitted employees of the NYPD to violate the constitutional rights of the citizens of the City without disciplinary risk or repercussions.

### *The Knapp Commission*

334.    The NYPD and its BOSSI Unit were examined by the Commission to Investigate Allegations of Police Corruption and the City's Anti-Corruption Practices (also known as the Commission to Investigate Alleged Police Corruption and informally as the Knapp Commission, after its chairman, Whitman Knapp).

335.    The Knapp Commission was established in May 1970 to investigate corruption within the NYPD. On December 26, 1972, the Commission issued its report, 'The Knapp Commission Report on Police Corruption," which confirmed the existence of widespread police corruption.

336.    Notably, the Knapp Commission found that the organizational fragmentation of the NYPD contributed to this problem of systematic police corruption. It wrote in its report that during the relevant period, "a number of administrative defects precluded effective investigations of

police corruption in New York City and indicated a lack of adequate planning by the Department's top management."

337.   It found in particular that "the Department's machinery for detecting and investigating police corruption was fragmented and even when unified was not given official standing, adequate records, or adequate manpower."

338.   Referring to a 1967 report by the International Association of Police Chiefs, the Knapp Commission noted that "the various units charged with searching out misconduct within the Department and with maintaining internal discipline, efficiency and integrity were widely dispersed, poorly coordinated, undermanned and, in many instances, so misdirected that they were almost totally ineffective in rooting out corrupt policemen." Among these units was BOSSI, which, along with the Central Investigations Division, was one of the two main intelligence units at the time.

339.   In 1971, while the Knapp Commission investigation was ongoing, a group of sixteen individuals filed *Handschu v. Special Services Division*, a class-action lawsuit brought against the City, the NYPD, and BOSSI in the United States District Court for the Southern District of New York. The suit challenged the intelligence unit's routine and widespread violation of the class Plaintiffs' constitutional rights through unlawful surveillance and other activities.

340.   As alleged in the *Handschu* Complaint, BOSSI conducted investigations "on a whim, in secrecy, without any civilian or judicial oversight."

341.   The *Handschu* case was settled in 1985, resulting in a consent decree setting forth guidelines for police surveillance and investigations involving political activity. In approving the proposed settlement, the Court observed that under these guidelines, "[t]he NYPD can no longer commence or continue investigations and surveillance secretly and in silence."

342.     The Knapp Commission investigation revealed that at the time of Malcolm X's assassination, BOSSI operated with minimal to no supervision and ample impunity and further found that [Defendant the City] was deliberately indifferent to or endorsed police misconduct, including suppression of exculpatory information. This shows a clear policy of the City of New York to commit these constitutional violations and torts and a failure to take reasonable steps to prevent this conduct.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**42 U.S.C. § 1983 - Excessive Force**
(Against NYPD BOSSI Defendants, Defendant Broderick, and Defendant John Does 21-35)

343.     Plaintiffs reallege and incorporate by reference all allegations and statements in each and all preceding paragraphs as if they were fully set forth herein.

344.     This Cause of Action is alleged against the NYPD BOSSI Defendants, Defendant Broderick, and Defendant John Does 21-35.

345.     The actions of these Defendants, individually, jointly and/or in conspiracy, together with other named and unnamed co-conspirators, including William Bradley, Talmadge Hayer, Leon Davis, Benjamin Thomas, and Wilbur McKinley, as set forth above, caused Malcolm X to be subjected to unreasonable, excessive, and deadly force in violation of his rights secured by the Fourth and Fourteenth Amendments to be free from unreasonable searches and seizures, and caused his death.

346.     As a direct and proximate result of the actions of these Defendants as set forth above, Malcolm X suffered severe damages, including injuries, death, pecuniary losses, conscious pain, and suffering, including pre-death terror and loss of enjoyment of life.

347.     As a direct and proximate result of the actions of these Defendants as set forth

above, Plaintiffs suffered severe damages, including pecuniary losses such as loss of income and inheritance, loss of financial security, loss of companionship, loss of parental advice and guidance, loss of spiritual advice and guidance, and the deprivation of all other services that would have been provided by Malcolm X as their father but for Defendants' acts and omissions.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983 - State Created Danger/Failure to Protect
(Against NYPD BOSSI Defendants, **Defendant** Broderick and Defendants John Does 21-35)

348.    Plaintiffs reallege and incorporate by reference all allegations and statements in each and all preceding paragraphs as if they were fully set forth herein.

349.    This Cause of Action is alleged against the NYPD BOSSI Defendants, Defendant Broderick, and Defendants John Does 21-35.

350.    The actions of these Defendants, individually, jointly and/or in conspiracy, as set forth above, created a danger that Malcolm X would be seriously injured or killed that would not have existed but for the Defendants' actions. This was a proximate and foreseeable result of Defendants' awareness of, involvement in, and knowing failure to prevent the assassination of Malcolm X.

351.    In creating this danger, Defendants were all deliberately indifferent to the known risk that Malcolm X would be injured or killed.

352.    In doing so, Defendants caused Malcolm X to be deprived of liberty without due process of law in violation of his rights under the Fourteenth Amendment.

353.    As a direct and proximate result of the actions of these Defendants as set forth above, Malcolm X suffered severe damages, including injuries, death, pecuniary losses, conscious pain, and suffering, including pre-death terror, and loss of enjoyment of life.

354.    As a direct and proximate result of the actions of these Defendants as set forth

above, Plaintiffs suffered severe damages, including pecuniary losses such as loss of income and inheritance, loss of financial security, loss of companionship, loss of parental advice and guidance, loss of spiritual advice and guidance, and the deprivation of all other services that would have been provided by Malcolm X as their father but for Defendants' acts and omissions.

### THIRD CAUSE OF ACTION

### 42 U.S.C. § 1983 - Denial of Access to Courts
(Against All NYPD Defendants, and Defendants John Does 21-50)

355.    Plaintiffs reallege and incorporate by reference all allegations and statements in each and all preceding paragraphs as if they were fully set forth herein.

356.    This Cause of Action is alleged against all of the NYPD Defendants and Defendants John Does 21-50.

357.    Defendants, individually, jointly, and in conspiracy with each other, by their obstruction of justice and concealment, suppression, and destruction of evidence, violated Plaintiffs' right to access to the courts, *inter alia*, by suppressing evidence favorable to the claims asserted herein, and by causing Plaintiffs to potentially forfeit several of their claims, to delay pursuing their other claims for many decades, and to proceed without key witnesses due to death and loss of memory, and crucial evidence which remains suppressed or has been destroyed, lost, or otherwise diminished due to the lapse in time, in violation of their First, Fifth and Fourteenth Amendment rights to due process of law and access to the courts.

358.    Plaintiffs, individually, and the Estate of Malcolm X were injured as a result of the Defendants knowingly making false representations of fact and/or knowingly attempting to fraudulently conceal from Plaintiffs and Malcolm X's family their conspiracy, grossly negligent failures to act and various violations of law as alleged herein for which Plaintiffs claim damages.

## FOURTH CAUSE OF ACTION

**42 U.S.C. § 1983 - Loss of Society, Services, and Parental Guidance**
(Against NYPD BOSSI Defendants, Defendant Broderick and Defendants John Does 21-35)

359.    Plaintiffs reallege and incorporate by reference all allegations and statements in each and all preceding paragraphs as if they were fully set forth herein.

360.    This Cause of Action is alleged against all of the NYPD BOSSI Defendants, Defendant Broderick, Defendant Helms, and Defendants John Does 21-35.

361.    The actions of these Defendants, as described above, caused Plaintiffs to lose the companionship of their father, Malcolm X, for the rest of their lives and thereby violated their Fourteenth Amendment right to due process of law.

362.    Due to the misconduct of these Defendants, Plaintiffs suffered the loss of society, care, companionship, protection, training, services, and parental guidance of Malcolm X.

## FIFTH CAUSE OF ACTION

42 U.S.C. §§ 1983, 1985, 1986 – Conspiracy
(Against All NYPD Defendants, FBI Defendants, Defendant Helms and
Defendants John Does 1-50)

363.    Plaintiffs reallege and incorporate by reference all allegations and statements in each and all preceding paragraphs as if they were fully set forth herein.

364.    This Cause of Action is alleged against all of the NYPD Defendants, the FBI Defendants, Defendant Helms, and Defendants John Does 1-50.

365.    Each of these Defendants, together with the named and unnamed co-conspirators, including William Bradley, Talmadge Hayer, Leon Davis, Benjamin Thomas, and Wilbur McKinley, together reached an understanding, engaged and continue to engage in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to commit the unconstitutional overt acts set forth in the facts above.

73

366.    The actions of these Defendants, jointly and/or in conspiracy, together with the named and unnamed co-conspirators, including William Bradley, Talmadge Hayer, Leon Davis, Benjamin Thomas, and Wilbur McKinley, as set forth above, were taken under the color of state law and caused Malcolm X to be subjected to unreasonable, excessive, and deadly force in violation of his rights as secured by 42 U.S.C §1983 and the Fourth and Fourteenth Amendments to be free from unreasonable searches and seizures, from the unreasonable use of deadly force, and from a state-created danger.

367.    Additionally, the actions of these NYPD and Federal Defendants, jointly and/or in conspiracy, together with the named and unnamed co-conspirators, including William Bradley, Talmadge Hayer, Leon Davis, Benjamin Thomas, and Wilbur McKinley, as set forth above, were taken under the color of state law and caused the Estate of Malcolm X and his Plaintiff-heirs to be denied access to the Courts, as guaranteed by the First, Fifth and Fourteenth Amendments to the United States Constitution.

368.    Because said conspiracies, joint actions, and the overt actions in furtherance thereof were done and continue to be done with the knowledge and purpose of depriving Malcolm X and Plaintiffs, who are Black, of the equal protection of the laws and/or of equal privileges and immunities under the law, and with racial, political and religious animus toward Malcolm X and Plaintiffs, these Defendants also deprived Plaintiffs of their right to equal protection of the laws under the Fourteenth Amendment and 42 U.S.C. § 1985.

369.    Additionally, or alternatively, these Defendants, knowing that the above § 1985 conspiracy to assassinate Malcolm X was about to be committed and having the power to prevent or aid in preventing the commission of the acts in furtherance of said conspiracy, neglected and/or refused to do so in violation of 42 U.S.C. § 1986.

370.    Additionally, or alternatively, these actions were taken maliciously, willfully, wantonly and/or with reckless disregard for Plaintiffs' constitutional rights.

371.    Each of these Defendants knowingly agreed, contrived, combined, confederated, and conspired between and among themselves to cause Plaintiffs' injuries by, *inter alia*, infiltrating the NOI and OAAU to create conflict and division within the organizations, making, not disclosing and/or not preventing known threats to Malcolm X's life, facilitating and/or participating in and/or failing to prevent the assassination of Malcolm X, and willfully misrepresenting and suppressing their co-conspirators', and their agencies' involvement in, and the truth regarding, the assassination of Malcolm X.

372.    The Defendants conspired together to devise, plan and implement certain intelligence/counterintelligence policies, programs, and activities, including but not limited to the FBI's COINTELPRO program, the stated purpose of which was to "disrupt," "neutralize," "cripple," and destroy the Black Liberation Movement and to "prevent the rise of a messiah who could unify and electrify" Black people. A crucial component of these policies and programs was to keep them secret at all costs.

373.    Marcus Garvey, Dr. Martin Luther King Jr., Stokely Carmichael, Fred Hampton, and Malcolm X, as leaders and members of the Black liberation struggles, were made targets of these program(s) and of its illegal tactics such as burglary, mail cover, wiretaps, raids, agents' provocateur, harassment, false arrest and prosecution, assault and battery, solicitation to murder, and murder itself by these Defendants.

374.    The FBI's programs relied on state and local law enforcement agencies, most particularly the NYPD's BOSSI, to implement "counterintelligence" against the NOI and OAAU, its leaders, and members. These defendants and others conspired to implement such

intelligence/counterintelligence operations against Malcolm X.

375.    The assassination of Malcolm X was a direct result of COINTELPRO and BOSSI's plans, programs, and policies, as devised and implemented by these Defendants, was in furtherance of their conspiratorial plan and intent to neutralize, cripple and destroy Malcolm X, and the organization of which he was a leader, and was a direct and proximate cause of the injury, death, pain, and suffering, and Constitutional deprivations set forth herein.

376.    In furtherance of said conspiracies, these Defendants performed the following non-exhaustive overt acts: (a) withheld, concealed, suppressed, destroyed and redacted  government files on Malcolm X, including FBI, CIA, and NYPD documents that Defendants accumulated since 1953; (b) placed undercover agents,  informants, and agent-provocateurs, including Defendants Ali, Roberts, Wood, Naheem, Timberlake and numerous still unidentified John and Jane Does into the ranks of the NOI and OAAU to create and exacerbate a violent conflict between the NOI and Malcolm X; (c) composed and mailed out fabricated letters to members of the NOI regarding Elijah Muhammad's extramarital affairs to influence Malcolm X in speaking out against Elijah Muhammad's conduct that was contrary to NOI practices and to undermine the previously strong relationship between Malcolm X and Elijah Muhammad; (d) withheld, concealed, and suppressed the ongoing intelligence they received regarding threats to Malcolm X's life that they began to obtain at least one year prior to his death; (e) orchestrated a sham conspiracy to attack  the Statue of Liberty as an excuse to arrest members of Malcolm X's security personnel and thereby ensure that  he had decreased protection the day of his assassination; (f) designated their officers and undercover agents to be present or near the assassination of Malcolm X but directed them not to intervene.

377.    Defendants further conspired to conceal the true nature of the assassination and

frustrate any redress Plaintiffs might seek. This continuation of the conspiracy extends from the day of the assassination to the present and consists in large part of the acts of the Defendants who withheld, concealed, and omitted the identifies of their undercover agents and/or informants present at the assassination; withheld and concealed the government files and documents that the Defendants' wrote and maintained regarding Malcolm X; withheld, concealed and omitted the identities of Defendants Ali, Roberts, and Wood as undercover agents and/or informants directed to infiltrate and disrupt Black organizations; falsely prosecuted and imprisoned Mr. Aziz and Mr. Islam, knowing of their innocence; and withheld, concealed, and omitted that their purpose and goal was to destroy Black leaders like Malcolm X and Black organizations like the OAAU and the NOI to prevent growth, progress, and strengthening of the Black Liberation Movement.

378.    Defendants' actions prevented Plaintiffs from learning of evidence that explained the cause and parties behind Malcolm X's assassination. DANY continued to prosecute the case with false and incomplete information. The evidence that was concealed included: (a) wiretaps against Malcolm X, the OAAU and the NOI; (b) the identity and activities of the informant-provocateur, John Ali, and numerous other FBI and BOSSI informants and agents, including numerous ones who witnessed the assassination; (c) infiltration, and other counterintelligence activities against Malcolm X; (d) the identity and activities of Eugene Roberts, Raymond Wood, and Does 1-50 in planning the February 21, 1965 assassination; (e) information that co-conspirators Bradley and Davis, rather than Aziz and Islam, shot Malcolm X and that Thomas and McKinley created a distracting disturbance (f) William Bradley's connection to the FBI; and (g) the existence of FBI and BOSSI counterintelligence programs designed to "neutralize," "cripple," and destroy Malcolm X and his Black liberation organization and to prevent the rise of a Black messiah, and the full scope of the actions taken in furtherance of those goals.

## SIXTH CAUSE OF ACTION

### 42 U.S.C. § 1983 - *Monell* Liability
(Against Defendant City of New York)

379.    Plaintiffs reallege and incorporate by reference all allegations and statements in each and all preceding paragraphs as if they were fully set forth herein.

380.    This Cause of Action is alleged against Defendant City of New York.

381.    The actions of the NYPD Defendants, as alleged above, were done pursuant to the de facto policies, practices, and/or customs of the City of New York, its Police Department, and/or its Police Commissioner.

382.    At all times material to this Complaint, Defendant City of New York and its Police Department and/or Police Commissioners had interrelated de facto policies practices, and customs which included, *inter alia*: (a) by and through BOSSI and other NYPD departments, working with the FBI, to plan, devise and implement illegal and unconstitutional surveillance, disruption, neutralization and destruction programs that targeted Black leaders and movements, including Malcolm X, the OAAU, and the NOI; (b) by and through BOSSI and other NYPD departments, planning, devising and implementing illegal, unconstitutional and, secret surveillance, infiltration, disruption, neutralization and destruction programs which targeted Black leaders and movements including Malcolm X, the OAAU and the NOI; (c) by creating and maintaining a culture of impunity, secrecy and a code of silence within the NYPD and BOSSI by, inter alia, failing to properly train, supervise, monitor, discipline or control NYPD officers involved in police misconduct and corruption; (d) by maintaining a system of undercover informants and agents who were permitted and often encouraged to provoke or even commit unconstitutional and illegal acts without fear of identification, discipline  or prosecution; and e) by suppressing exculpatory evidence from criminal defendants.

383.   The policies, practices, and customs, as set forth above, are interrelated and exacerbate the effects of each other to institutionalize police misconduct, lying, and cover-up and to immunize police officers from discipline.

384.   The knowledge of, involvement in, and ratification of the unconstitutional actions of the NYPD Defendants and the policies and practices set forth above by municipal supervisors and policymakers, including Defendant Commissioners Broderick and Leary, including their failure to monitor, supervise, control, and discipline officers for the actions set forth above and for failing to adequately discipline officers who have been accused of misconduct further establish that these acts were part of widespread and interrelated municipal policies, practices and customs.

385.   The aforementioned policies, practices and/or customs, separately and together, proximately caused injury to Plaintiffs in this case, inter alia, because the NYPD Defendants had good reason to believe that their misconduct would not be revealed or reported by fellow officers, their control agents, or their supervisors, that the NYPD Defendants' failures to disclose, and denials of, misconduct would go unchallenged by these supervisors and fellow officers, from the Defendant Police Commissioners on down through the ranks, and that they were effectively immune from disciplinary action, thereby protecting them from the consequences of their unconstitutional conduct. But for the belief that they would be protected by fellow officers, supervisors, command personnel, and the NYPD from serious career, criminal, and civil consequences, the NYPD Defendants would not have engaged in the conduct that resulted in the assassination of Malcolm X and its resultant cover-up.

386.   Said interrelated policies, practices, and customs, as set forth above, both individually and together, were maintained and implemented with deliberate indifference and encouraged the Defendants to commit the aforesaid acts against Malcolm X and therefore acted as

a moving force and were, separately and together, direct and proximate causes of said constitutional violations, and injuries to Plaintiffs.

## SEVENTH CAUSE OF ACTION

**The Federal Tort Claims Act**
(Against Defendant United States)

387.    Plaintiffs reallege and incorporate by reference all allegations and statements in each and all preceding paragraphs as if they were fully set forth herein.

388.    This Cause of Action is alleged against Defendant United States.

389.    At all times material to this case, the FBI Defendants, Defendant Helms, and other agents and employees of the FBI, CIA, and DOJ, whose actions are referred to herein, were acting within the scope of their employment with the Defendant United States when they conspired to cause and allowed to be caused the assassination of Malcolm X and fraudulently concealed their involvement in, and the true circumstances of, Malcolm X's assassination.

390.    The United States, if a private person, would be liable to Plaintiffs for the acts and omissions of its employees and agents described herein under the law of the place where said acts and omissions occurred (or did not occur), to wit, including, but not limited to, under common law tort claims arising under New York state law for fraudulent concealment, wrongful death, negligence, gross negligence, failure to warn, failure to protect, intentional infliction of emotional distress, right to privacy, conspiracy, conscious pain and suffering, negligent hiring, retention, supervision of its agents and employees, including informants, and negligence per se, all of which was the proximate cause of the assassination of Malcolm X and its cover-up.

## EIGHTH CAUSE OF ACTION

**State Law – Fraudulent Concealment**
(Against All NYPD Defendants, FBI Defendants, Defendant Helms and Defendants John Does 1-50)

80

391.    Plaintiffs reallege and incorporate by reference all allegations and statements in each and all preceding paragraphs as if they were fully set forth herein.

392.    This Cause of Action is alleged against all of the NYPD Defendants, the FBI Defendants, Defendant Helms, and Defendants John Does 1-50.

393.    At all times relevant herein, including the date of Malcolm X's assassination, February 21, 1965, to the present, Defendants failed to advise Plaintiffs and Malcolm X's family of any and all details surrounding Malcolm X's death, including but not limited to, the known history of government surveillance, communication, disruption and misconduct by the FBI, NYPD and CIA, the known history of investigations and reports both by and against the FBI, CIA and NYPD, and its special unit, BOSSI in the past, the actual knowledge of witnesses present at the assassination of Malcolm X, the NYPD, CIA, FBI, and Defendant Hoover's years of surveillance of Malcolm X prior to his death, the actual knowledge of the NYPD's inadequate policies, customs, and supervision rendered in the investigation of Malcolm X's death, and material evidence that is still unknown to this date.

394.    Defendants' failure to inform Plaintiffs Malcolm X's family of the true circumstances surrounding Malcolm X's assassination and its cover-up constituted a materially false representation of fact and/or a lie of omission.

395.    Defendants knew and/or should have known that the failure to inform Plaintiffs and Malcolm X's family of the aforementioned issues surrounding Malcolm X's assassination and resultant cover-up constituted a materially false representation of fact.

396.    By failing to inform Plaintiffs and Malcolm X's family of the true circumstances surrounding Malcolm X's assassination and its cover-up, Defendants knew or should have known that the same was an attempt to fraudulently conceal from Plaintiffs and Malcolm X's family,

Defendants' conspiracy and misconduct as alleged herein.

397.    The Defendants' false misrepresentation of fact and/or concealment of pertinent and relevant information herein amounted to fraud.

398.    Prior to filing the instant Complaint, Plaintiffs and Malcolm X's family justifiably relied on the Defendants' lie of omission in believing the results of Defendants' investigations surrounding Malcolm X's death.

399.    Plaintiffs, individually, and the Estate of Malcolm X were injured as a result of the Defendants knowingly making false representations of fact and/or knowingly attempting to fraudulently conceal from Plaintiffs and Malcolm X's family their conspiracy, negligent, and intentional failures to act and various violations of law as alleged herein for which Plaintiffs claim damages.

## NINTH CAUSE OF ACTION

### State Law – Wrongful Death
(Against NYPD BOSSI Defendants, Defendant Broderick, and Defendants John Does 21-35)

400.    Plaintiffs reallege and incorporate by reference all allegations and statements in each and all preceding paragraphs as if they were fully set forth herein.

401.    This Cause of Action is alleged against the NYPD BOSSI Defendants, Defendant Broderick, and Defendants John Does 21-35.

402.    Plaintiff Ilyasah Shabazz is the duly appointed Administrator d.b.n. of the Estate of Malcolm X. Ilyasah Shabazz, Gamilah Lamumba Shabazz, and Malaak Shabazz are the surviving next of kin of Malcolm X.

403.    The assassination of Malcolm X was proximately caused by the wrongful acts, neglect and/or default of the NYPD BOSSI Defendants, Defendant Broderick, and Defendants John Does 21-35, as described above in violation of New York state law.

404. The Defendants' wrongful conduct was the direct and proximate cause of injury and damage to Malcolm X, his Estate, and his heirs.

405. As next of kin, the heirs of Malcolm X have lost and will continue to lose pecuniary support, consortium, society, companionship as well as the love and affection of their father.

## DAMAGES

406. As a direct result of the Defendants' intentional, bad faith, willful, wanton, reckless, unreasonable, and/or deliberately indifferent acts and omissions, Malcolm X was deprived of his federal constitutional rights, as set forth above, including his constitutional rights to life, and his rights to be free from excessive and deadly force, and suffered severe damages, including pecuniary losses, conscious pain, and suffering, including pre-death terror, and loss of enjoyment of life.

407. As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, unreasonable, and/or deliberately indifferent acts and omissions, Plaintiffs were robbed of their father and suffered grievous and continuing damages, including pecuniary losses such as loss of income and inheritance, loss of financial security, loss of companionship, funeral and burial expenses, loss of parental advice and guidance, loss of spiritual advice and guidance, and the deprivation of all other services that would have been provided by Malcolm X as their father but for Defendants' acts and omissions.

408. As a direct result of the acts and omissions of Defendants, Plaintiffs have been wrongfully denied the company, services, spiritual guidance, comfort, financial security, and companionship of their father and grandfather, were forced to endure mental cruelty associated with the unexplained death of their father and the knowledge, acquired over fifty-nine years later, that his death had been orchestrated by the same officials sworn to protect them and their father.

## JURY DEMAND

409.    Pursuant to the Seventh Amendment of the United States Constitution and Fed. R. Civ. P. 38(b), Plaintiffs request a jury trial on all issues and claims set forth in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment against Defendants, granting Plaintiffs the following relief:

(a) The entry of judgment in favor of the Plaintiffs on each and every cause of action;

(b) Award compensatory damages to them and against the Defendants, jointly and severally, in excess of $100,000,000 (ONE-HUNDRED MILLION DOLLARS);

(c) Award punitive damages to them and against all individual Defendants, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

(d) Award reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees under 42 U.S.C. 1988;

(e) Award pre-judgment and post-judgment interest and recovery of their costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988;

(f) Such other relief as the Court deems just and proper.

Dated: November 15, 2024
New York, NY

Respectfully Submitted:

/s/
Benjamin L. Crump*
BEN CRUMP LAW, PLLC
633 Pennsylvania Avenue Northwest
Second Floor
Washington, DC 20004
Telephone: 800-959-1444
court@bencrump.com

84

Nabeha Shaer
Desiree Austin-Holliday*
**BEN CRUMP LAW, PLLC**
633 Pennsylvania Avenue Northwest
Second Floor
Washington, DC 20004
nabeha@bencrump.com
desiree@bencrump.com

Raymond L. Hamlin*
**HUNT, HAMLIN & RIDLEY**
Military Park Building
60 Park Place
Sixteenth Floor
Newark, New Jersey 07102
Telephone: 973-242-4471
Fax: 973-242-8295
ray.hamlin@hunthamlinridley.com

G. Flint Taylor*
Ben H. Elson*
**PEOPLE'S LAW OFFICE**
1180 N. Milwaukee Ave.
Chicago, IL 60642
Telephone: (773) 235-0070
Fax: (773) 235-6699
flinttaylor@peopleslawoffice.com
ben@peopleslawoffice.com


Jonathan C. Moore
David Rankin
Luna Droubi
**BELDOCK LEVINE & HOFFMAN LLP**
99 Park Ave., PH/26th Floor
New York, NY 10016

*Counsel for Plaintiffs*

\*Pro hac vice or admission forthcoming.