UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Ilyasah Shabazz, et al.,
Plaintiffs,
v.
United States of America, et al.,
Defendants.

24 Civ. 8680 (DEH)

**OPINION AND ORDER**

DALE E. HO, United States District Judge:

Ilyasah Shabazz, as administrator of the Estate of Malcolm X, and Ilyasah Shabazz, Gamilah Lamumba Shabazz, and Malaak Shabazz as daughters of Malcolm X (collectively, "Plaintiffs"), bring this action under 42 U.S.C. §§ 1983, 1985, and 1986 and under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671-2680, seeking damages for alleged misconduct by Federal Government and NYPD officials culminating in and concealing their role in the 1965 assassination of Malcolm X.[1]

Plaintiffs assert five federal claims against the Individual Defendants: (1) excessive force, (2) state created danger/failure to protect, (3) denial of access to the courts, (4) loss of society, services, and parental guidance, and (5) conspiracy. They bring a *Monell* claim against the City of New York. They assert twelve state law claims against the United States under the FTCA: (1) fraudulent concealment, (2) wrongful death, (3) negligence, (4) gross negligence, (5) failure to

[1] Plaintiffs sue the federal government and three federal agencies, as well as federal officers in their individual capacities. They also sue the City of New York and former NYPD officers in their individual capacities. For consistency, this Opinion refers to all federal government entities and individual federal officers as the "Federal Defendants," collectively. It refers to all municipal government entities and individual NYPD officers as the "City Defendants," collectively. It refers to the federal and municipal officers collectively as the "Individual Defendants." The Court addresses the identities of the Individual Defendants in further detail, *infra*.

warn, (6) failure to protect, (7) intentional infliction of emotional distress, (8) right to privacy, (9) conspiracy, (10) conscious pain and suffering, (11) negligent hiring, retention, and supervision of agents and employees, and (12) negligence per se. And they assert two state law claims against Individual Defendants: (1) fraudulent concealment and (2) wrongful death.

Before the Court is the Federal Defendants' motion to dismiss Plaintiffs' claims brought under the FTCA and against the Individual Federal Defendants, ECF No. 117. For the reasons that follow, the motion is **GRANTED**.

## BACKGROUND[2]

Malcolm X was a renowned leader and advocate for the Black community, who had been a prominent member of the Nation of Islam ("NOI") and served as a founding member of the Organization of Afro-American Unity ("OAAU"). *Shabazz v. United States*, No. 24 Civ. 8680, ECF No. 12 ("Compl.") ¶¶ 1. He spoke widely before national and international audiences on social issues affecting the Black community. *Id.* ¶¶ 91-98.

On February 21, 1965, Malcolm X held a speaking engagement at the Audubon Ballroom in New York City. *Id.* ¶¶ 192. Malcolm X began his remarks at approximately 3:00 p.m. *Id.* ¶ 195. Shortly after his speech began, multiple individuals caused a disruption in the ballroom. *Id.* ¶¶ 196, 199. As the disruption ensued, William Bradley, Talmadge Hayer, and Leon Davis fatally shot Malcolm X. *Id.* ¶¶ 200-01, 208.

Plaintiffs allege that the Defendants—leading up to, during, and following Malcolm X's assassination—failed to protect Malcolm X, actively facilitated his assassination, and subsequently concealed their involvement in his death.

---

[2] The following facts are taken from the Complaint and are assumed to be true for purposes of this motion. *See, e.g.*, *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009).

### A. The Defendants

1. Federal Defendants

Plaintiffs sue the United States, the Federal Bureau of Investigation ("FBI"), the Department of Justice ("DOJ"), and the Central Intelligence Agency ("CIA") under the FTCA.

J. Edgar Hoover was Director of the FBI at all times relevant to Plaintiffs' claims. Compl. ¶ 42. Plaintiffs sue the estate of FBI Director J. Edgar Hoover "in his individual capacity as a conspirator with the NYPD defendants." *Id.* Likewise, Plaintiffs sue the estates of Assistant Director of the FBI, William C. Sullivan and George C. Moore, head of the FBI's Racial Intelligence Section. *Id.* ¶ 43.

Richard McGarrah Helms was a Deputy Director of the CIA and subsequently the CIA Director from 1966 to 1973. *Id.* ¶ 45. Plaintiffs sue Helms's estate in his individual capacity. *Id.*

Plaintiffs sue Arthur Fulton, August Micek, Dale Sutton, and Steven Edwards: FBI agents who Plaintiffs allege were directly involved with or subsequently concealed the Defendants' involvement with Malcolm X's assassination. *Id.* ¶¶ 46-47.

Plaintiffs sue John Ali Simmons and Abdul Basit Naeem, who Plaintiffs allege served as informants tasked by the FBI with infiltrating the NOI. *Id.* ¶¶ 48-49. They also sue Ronald Timberlake, alleged to be another FBI informant who participated in concealing Defendants' involvement with the assassination. *Id.* ¶ 49.

Beginning in the 1950s, under the leadership of J. Edgar Hoover, the FBI initiated a counterintelligence program known as COINTELPRO. *Id.* ¶ 106. As part of the COINTELPRO program, the federal government targeted and surveilled disfavored groups, including Black activists and groups. *Id.* ¶¶ 107-12. In a March 1968 memo written by FBI officials, including Hoover, Sullivan, and Moore, the FBI identified specific Black activists, including Malcolm X, and organizations including the Nation of Islam as targets of the COINTELPRO program. *Id.* ¶¶

112-14. The COINTELPRO program involved the use of informants, the orchestration of burglaries, the facilitation of improper arrests and prosecutions, and the coordination of violent police raids against targeted individuals and groups. *Id.* ¶¶ 114-16. As part of the program, federal agents worked with local law enforcement agencies, including the NYPD. *Id.* ¶ 117. Plaintiffs allege that Defendants employed by the FBI kept evidence of "illegal and unconstitutional activities" undertaken in furtherance of the COINTELPRO program, but that a significant number of these records, including Hoover's personal files, were destroyed following his death. *Id.* ¶ 119.

2. City Defendants

Plaintiffs also sue the City of New York for actions taken by the New York City Police Department ("NYPD"). They sue Vincent Lyons Broderick and Howard R. Leary, former NYPD Commissioners, who respectively oversaw the NYPD during the assassination and subsequent alleged cover-up. *Id.* ¶¶ 57-58.

Plaintiffs sue Defendants Anthony Bouza, Gerry Fulcher, William Knapp, Bernard F. Mulligan, Eugene A. Roberts, Henry Suarez, Theodore Theologes, Raymond A. Wood, and multiple unnamed John and Jane Doe individuals employed by the NYPD, who Plaintiffs allege worked as members of the NYPD's Bureau of Special Services and Investigations ("BOSSI"). Compl. ¶¶ 59-66. Plaintiffs purport to sue Bouza, Roberts, and Wood in their individual capacities through their estates. Compl. ¶¶ 59, 63, 65.[3]

Plaintiffs also sue Defendants Ferdinand Cavallaro, William E. Confrey, John J. Conroy, Thomas T. Cusmano, Winston W. De Vergee, Joseph Iacovelli, John J. Keeley, James Rushi,

---

[3] Plaintiffs have been unable to serve or locate NYPD Defendants Cilento, Leary, Iacovelli, Fulcher, Conroy, Theologes, Roberts, Cavallaro, Sullivan, Knapp, Suarez, Willis, and Taylor. Pls' Mem. in Opp'n to Mot. to Dismiss ("Pls. Mem.") 45 n. 7, ECF No. 125. Likewise, they have been unable to serve or locate J. Edgar Hoover, Abdul Basit Naeem, John Ali Simmons, Ronald Timberlake, and Steven Edwards. *Id.*

Howard G. Schaetzle, Warren Taylor, Patrick J. Twomey, Ernest Vohs, Michael Willis, Francis Cilento, Sanford Garelik, Thomas C. Renaghan, Francis J.M. Robb, Francis M. Sullivan, and multiple unnamed John and Jane Doe individuals who are additional Detectives, Officers, Inspectors, and Lieutenants employed by the NYPD, but not within BOSSI. *Id.* ¶¶ 67-72.

BOSSI was an intelligence gathering unit within the NYPD that targeted and surveilled disfavored individuals and social groups including alleged communists during the McCarthy era. *Id.* ¶ 121. In the 1960s, Plaintiffs allege that BOSSI targeted Malcolm X, the OAAU, the NOI, and the Black Panther Party. *Id.* ¶ 122. Plaintiffs allege that in the period relevant to their claims, the City of New York and the NYPD did not maintain "adequate rules or regulations to ensure that BOSSI operated within the confines of the law." *Id.* ¶ 124. BOSSI tactics included the surveillance and infiltration of targeted communities, including through the use of informants and undercover agents, and the dissemination of inflammatory information about targeted individuals and groups. *Id.* ¶ 125.

Information about BOSSI operations and undercover agents was kept secret, and Plaintiffs allege that "[a]s a matter of policy, custom, and practice, BOSSI and the NYPD suppressed information to protect the BOSSI surveillance machinery and the identities of its undercover agents." *Id.* ¶ 127.

### B. Defendants' Targeting of Malcolm X

Plaintiffs allege that the Federal and City Defendants targeted Malcolm X as part of their practice of surveilling and disrupting the activities of disfavored individuals and groups, and they further allege that through their activities, the Federal and City Defendants knew of imminent danger to Malcolm X's life. *Id.* ¶¶ 129-31; 172.

After opening a file on Malcolm X in 1953, the FBI began targeting him as part of the COINTELPRO program. *Id.* ¶¶ 129, 131. Under the auspices of the program, the FBI sought to

foment tension between Malcolm X and Elijah Muhammad, the leader of NOI. *Id.* ¶ 131-36. In 1964, at Hoover's direction, the FBI began surveilling Malcolm X's home. *Id.* ¶¶ 141-42. Plaintiffs allege that Fulcher, employed by BOSSI, admitted to wiretapping Malcolm X at the OAAU headquarters and passing on surveillance tapes to local and federal law enforcement intelligence divisions. *Id.* ¶ 143.

Plaintiffs allege that, encouraged by the FBI and BOSSI operations, the NOI labeled Malcolm X as a primary threat to the organization. *Id.* ¶ 148. They allege that in 1964, Malcolm X was poisoned during a visit to Egypt, and made public statements about threats to his life, including by the NOI. *Id.* ¶¶149-51. At least two internal FBI documents from 1964 indicated that FBI officials were aware of Malcolm X's statements about threats against him, *id.* ¶¶ 152, 156, and a July 7, 1964 FBI memorandum to Hoover indicated that an individual whose identity was redacted had provided information about "orders to kill" Malcolm X, *id* ¶ 165. Malcolm X continued to experience death threats, and on July 7, 1964 contacted the NYPD to report an attempt on his life. *Id.* ¶¶ 169, 172. The night of February 14, 1965, Malcolm X's home was firebombed. *Id.* ¶ 180.

### C. Defendants' Alleged Involvement in Malcolm X's Death

Plaintiffs allege that Ray Wood, working as an undercover agent for BOSSI, targeted two of Malcolm X's bodyguards, entrapping them and leading to their arrest for an alleged plot to attack the Statue of Liberty. *Id.* ¶ 182. They allege that BOSSI and the Federal Defendants coordinated these arrests to weaken Malcolm X's security in the days leading up to his assassination. *Id.* ¶ 183. Malcolm X had previously accepted police protection during trips to Los Angeles and Chicago. *Id.* ¶ 211. Plaintiffs allege that the NYPD refused Malcolm X's requests for police protection leading up to his speaking engagement at the Audubon Ballroom and never approved his request for a firearm permit for personal protection. *Id.* ¶ 210. On the day of

Malcolm X's assassination, Plaintiffs allege that the NYPD changed its common practice of providing a visible presence at the venue. *Id.* ¶ 194. An FBI memorandum addressed to Hoover and dated the day after the assassination detailed a conversation involving an unnamed confidential informant in which one individual advised the other that "Washington and C.I.A." "wanted Malcolm out of the way because he 'snafued' African relations for the U.S." *Id.* ¶ 215.

Plaintiffs also allege that BOSSI Defendant Eugene Roberts infiltrated Muslim Mosque Inc. and posed as one of Malcolm X's bodyguards in order to report information about the organization and the OAAU to the NYPD. *Id.* ¶ 251. Plaintiffs allege that, while posing as a member of Malcolm X's security team, Roberts witnessed an individual standing up during one of Malcolm X's speaking engagements at the Audubon Ballroom days before the assassination and reported to the NYPD his suspicion that the individual might be planning something the following Sunday—the day of the actual assassination. *Id.* ¶¶ 252-56. Roberts would later witness the assassination, attempted to resuscitate Malcolm X afterward, and said in a subsequent interview that he was chastised by his BOSSI handlers for attempting to do so. *Id.* ¶ 265.

### D. Federal and NYPD Investigation into Malcolm X's Assassination

The FBI and the NYPD jointly investigated Malcolm X's assassination and collaborated in the subsequent prosecution of Talmadge Hayer, Muhammad Aziz, and Khalil Islam. *Id.* ¶¶ 217, 222, 230. The FBI possessed and provided information to the NYPD about individuals present in the Audubon Ballroom at the time of the assassination. *Id.* ¶ 221. The FBI and BOSSI jointly participated in a subset of interviews with witnesses. *Id.* At least ten eyewitnesses to the assassination were FBI informants. *Id.* ¶ 223. The Complaint alleges that during the investigation, NYPD investigators "employed identification procedures they knew were improper and created a substantial risk of false identification." *Id.* ¶ 226. It also alleges that NYPD investigators

"witnessed [these improper procedures], frequently failing to document the misconduct and, in all cases, failing to cause the disclosure of the misconduct." *Id.* ¶ 227.

The FBI and NYPD, through threats and pressure, influenced the grand jury and trial testimony of multiple eyewitnesses, including Cary Thomas, Vernal Temple, Edward DePina, Jasper Davis, Charles Blackwell, Fred Williams, Ronald Timberlake, and Earl Grant. *Id.* ¶¶ 229-245.

**E. Exonerations of Khalil Islam and Muhammad A. Aziz**

Beginning in 2020, the New York District Attorney's Office ("DANY") reinvestigated the convictions of Muhammad Aziz and Khalil Islam for the assassination of Malcolm X. *Id.* ¶ 291.[4] The reinvestigation uncovered previously undisclosed FBI documents containing information that exculpated Mr. Aziz and Mr. Islam. *Id.* These documents included FBI reports that included a description of the actual killers that did not match Mr. Aziz and Mr. Islam, documents that showed that the only eyewitnesses who identified Mr. Aziz and Mr. Islam as the killers were FBI informants, and a report that stated that eyewitnesses who reviewed photos of Mr. Islam failed to place him at the Audubon Ballroom the day of the assassination. *Id.* DANY made this and other information public when on November 18, 2021, it moved to vacate Mr. Aziz and Mr. Islam's convictions. *Id.* ¶¶ 292.

Plaintiffs identify information made public pursuant to DANY's investigation into the convictions of Mr. Islam and Mr. Aziz, which include:

> "[A]n FBI report dated February 22, 1965, stating that 'the killers of Malcolm X were possibly imported to NYC' and that the shooters sat in the front seats of the

---

[4] Due to a formatting error in the Complaint, the numbering for paragraphs 290 through 292 appears twice. The references in this section are to paragraphs 290 through 292 on pages 61 and 62 of the Complaint.

Audubon Ballroom, and providing detailed descriptions of the two suspects." *Id.* ¶ 301.

"An FBI report dated February 25, 1965, indicating that, at then-Director J. Edgar Hoover's behest, local FBI officers were instructed not to disclose to the NYPD the FBI informant status of any witness in the murder investigation." *Id.*

"An FBI report dated March 4, 1965, containing information about a known associate of Halim's nicknamed "Turk," noting, *inter alia*, that "Turk" was believed to be Leon Davis—the man now known to have shot Malcolm X with a 9 mm semiautomatic handgun, *i.e.*, the conduct attributed to Mr. Aziz in the criminal case." *Id.*

"A police report dated March 8, 1965, with information from an eyewitness to the murder, describing the shooters as men from the Nation of Islam and based in New Jersey who sat in the front row on the left-hand side, with "Benjamin from Paterson or Newark" seated two rows behind them—precisely matching Hayer's description of himself, Leon Davis, and Benjamin Thomas." *Id.*

"An FBI report dated March 25, 1965, summarizing intelligence that one of the shooters came from Newark, New Jersey." *Id.*

"An FBI dossier on William Bradley . . . containing detailed information collected between 1963 and 1965." *Id.*

"An April 13, 1965 memorandum from . . . Hoover to the Special Agent in Charge of the New York Field Office, instructing that the FBI's intelligence implicating 'a lieutenant from the Newark Temple of the Nation of Islam'—referring to Bradley—must 'not be furnished to the [NYPD] without first receiving Bureau authority." *Id.*

"[R]eports from BOSSI Defendant Eugene Roberts corroborating Hayer's account of the murder and undermining the testimony of every prosecution witness." *Id.*

## LEGAL STANDARD[5]

The Federal Defendants bring their motions to dismiss under Rules 12(b)(1), 12(b)(2), and 12(b)(6) of the Federal Rules of Civil Procedure.

---

[5] All references to Rules are to the Federal Rules of Civil Procedure. In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional authority to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). In resolving such a motion, "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff," *Nat. Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006), but "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inference favorable to the party asserting it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008). "In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings." *Makarova*, 201 F.3d at 113.

To survive a motion to dismiss under Rule 12(b)(2), "[p]laintiffs need only make a prima facie showing of personal jurisdiction over the defendant[s]." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010).

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In assessing the complaint, the court "must construe it liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor." *Id.* at 106-07. But the court must disregard any "conclusory allegations, such as 'formulaic recitations of the elements of a cause of action.'" *Id.* at 107 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

## DISCUSSION

The Federal Defendants move to dismiss each of Plaintiffs' Federal Tort Claims Act claims, and claims against Individual Federal Defendants. *See* Mem. of Law in Supp. of Fed. Defs' Mot. to Dismiss ("Fed. Gov't Mem."), ECF No. 118.

### I. Jurisdiction Over Deceased Individual Defendants

Plaintiffs purport to sue multiple deceased Individual Defendants through their estates. In addition, they have served the next-of-kin of Defendants George Moore, William Cornelius Sullivan, Patrick J. Twomey, Anthony Ulasewicz, William E. Confrey, and John J. Keeley. Pls. Mem. at 45 n.7. Of the named Individual Defendants, only one: Arthur Fulton, has been sued directly in his individual capacity. Plaintiffs concede that "all but one of the Individual Defendants are now deceased." Pls. Mem. at 41.

Defendants argue that there is no jurisdiction to sue deceased Individual Defendants in their individual capacities through their estates that either never existed or have already been discharged. Mem. of Law Addressing Issues Related to Service and Jurisdiction Over Deceased Individuals ("City Gov't Mem.) at 2-3, ECF No. 132; Fed. Gov't Mem. at 30-31. The Court does not agree with this proposition categorically. However, the Court concludes, under the facts of this case, that there is no jurisdiction over the deceased Individual Federal Defendants.[6]

Defendants argue that estates of individuals deceased prior to the initiation of a lawsuit are legal nullities incapable of being sued. City Gov't Mem. at 3; Fed. Gov't Mem. at 30-31. Defendants cite multiple cases that support their argument that under New York law, there is no

---

[6] Currently before the Court is the Federal Defendants' Motion to Dismiss the Complaint. However, the City Defendants were permitted limited briefing on the issue of jurisdiction over deceased individuals and their estates. *See* Mem. of Law Addressing Issues Related to Service and Jurisdiction Over Deceased Individuals ("City Gov't Mem."), ECF No. 132.

jurisdiction over decedent estates that no longer exist at the time a lawsuit was filed. *See Wilmington Tr., Nat'l Ass'n v. Estate of McClendon*, 287 F. Supp. 3d 353, 373 (S.D.N.Y. 2018) ("under New York law, an estate is not a legal entity and any action for or against the estate must be by or against the executor or administrator in his or her representative capacity") (internal quotation marks omitted); *Water Energizers, Ltd. v. Water Energizers, Inc.*, 788 F. Supp. 208, 211 (S.D.N.Y. 1992) ("plaintiff has failed to make even a prima facie showing of personal jurisdiction as to the Estate . . . [which] does not exist, having been wound up prior to service of this action."); *but see Gabriel v. Newrez LLC*, 2023 WL 2587506, at *6 (E.D.N.Y. Mar. 21, 2023) ("Although a New York court will dismiss an action commenced against a deceased defendant as a legal 'nullity' and for lack of 'jurisdiction,' such dismissals are not said to be for lack of personal jurisdiction.").

In response, Plaintiffs cite *Washington v. Fed. Bureau of Prisons* for the proposition that a court may authorize the continuation of proceedings against a decedent's estate. 2022 WL 3030749 (D.S.C. July 29, 2022). However, in that case, jurisdiction was not at issue, and the district court allowed the claims to proceed because the estate's representatives had waived any arguments about the validity of claims against the defendant estate. *Id.* at *5 ("Defendant's counsel have continued to represent the Estate and have made no further challenge to the validity of Plaintiff's claim against Dr. Loranth. Now, with trial fast approaching in a case that is five and a half years old, Defendants for the first time raise the theory that the claim against the Estate in this Court should be dismissed for failure to timely present a state probate claim . . .").

More convincingly, Plaintiffs also cite a number of cases where courts have allowed plaintiffs to sue estates of deceased individuals where another defendant to the suit has a statutory duty to indemnify the decedent. *See Harris ex rel Estate of Harris v. Zuley*, 2024 WL 1739913 (N.D. Ill. Apr. 23, 2024); *Mazza v. City of Boston*, 753 F. Supp. 3d 88 (D. Mass. 2024); *Tankleff v. Cnty. of Suffolk*, 2016 WL 3162059 (E.D.N.Y. June 2, 2016). But Defendants argue that no

such duty exists here. As to the Individual Federal Defendants, Plaintiffs cite no authority to indicating that the Federal Government had a duty to indemnify them. Plaintiffs instead state simply that "there is no question that the individuals were acting within the scope of their employment," and claim that the Federal Government "seems to concede representation of the individuals." Pls. Mem. at 46. For the former proposition, Plaintiffs cite the Federal Defendants' statement in their brief that "Plaintiffs do not allege that any of the supposedly negligent supervisory acts were committed by FBI employees outside the scope of their employment." *Id.* (citing Fed. Gov't Memo at 23). But that statement—an argument that Plaintiffs have failed to state an element of a claim—is not a concession that, in fact, all the Individual Federal Defendants were working in the scope of their employment.

In any event, Plaintiffs expressly bring their claims against the Individual Federal Defendants in their individual capacities. "In an official capacity suit, the real party in interest is the governmental entity and not the named official. By contrast, individual capacity suits seek to impose individual liability upon a government officer for [their] actions under color of [ ] law." *Tanvir v. Tanzin*, 894 F.3d 449, 459 (2d Cir. 2018) (internal citations and quotation marks omitted). "Any damages awarded in an individual capacity suit will not be payable from the public fisc but rather will come from the pocket of the individual defendant." *Id.* (citing *Blackburn v. Goodwin*, 608 F.2d 919, 923 (2d Cir. 1979)) (internal quotation marks omitted). Having styled their claims as brought against the Individual Defendants in their individual capacities, Plaintiffs cannot claim that personal jurisdiction is appropriate over them because of a purported duty to indemnify.

Plaintiffs also argue that for those Individual Defendants whose next of kin have been served, the next of kin may be substituted pursuant to Rule 25 as successors in interest. Pls. Mem. at 47-49. But Plaintiffs cite only one case involving arguably analogous circumstances. *Tankleff v. Cnty. of Suffolk*, 2016 WL 3162059 (E.D.N.Y. June 2, 2016) (holding that a deceased defendant

police officer's distributees could be substituted pursuant to Rule 25). However, in *Tankleff*, the police officer was already a party to the lawsuit prior to his death. *See id.* at *1. Plaintiffs cite no authority for the proposition that a Rule 25 substitution may be made for an individual who was deceased prior to the initiation of a lawsuit. Accordingly, this argument is unavailing.

In sum, while there may be some limited circumstances in which a lawsuit may proceed against a deceased person's estate, Plaintiffs have failed to establish that any such circumstances are present here. Accordingly, the claims against deceased Individual Federal Defendants are **DISMISSED WITH PREJUDICE** for lack of jurisdiction.[7]

## II. Statute of Limitations

Under the doctrine of sovereign immunity, the United States is immune from suit except where it consents to be sued. *United States v. Sherwood*, 312 U.S. 584, 586 (1941). The FTCA waives sovereign immunity where a claimant's injuries were "caused by the negligent or wrongful act or omission of any employee of the Government," acting within the scope of employment, "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

The FTCA provides for a two-year statute of limitations from the time that a claim accrues. 28 U.S.C. § 2401(b) (an FTCA claim "shall be forever barred unless it is presented in writing to

[7] The City Defendants also raise the argument that there can be no jurisdiction for claims against the deceased Individual City Defendants because the City had no duty to indemnify them. *See* City Defs. Mem. at 5 ("in *Tankleff* . . . indemnification was required under a different statute that expressly does not apply to the City of New York" (citing Gen. Mun. L. § 50-j(4))). Because there has not yet been full briefing on the issue of whether the City has a duty to indemnify the deceased Individual City Defendants, the Court reserves judgment on whether those Defendants must also be dismissed for the same reasons pending formal briefing on a motion to dismiss by the City Defendants.

the appropriate Federal agency within two years after such claim accrues"). However, the two-year statute of limitations may be equitably tolled in certain circumstances. *United States v. Kwai Fun Wong*, 575 U.S. 402, 413-14 (2015). For example, "read into every federal statute of limitations is the equitable doctrine that in case of defendant's fraud or deliberate concealment of material facts relating to his wrongdoing, time does not begin to run until plaintiff discovers, or by reasonable diligence could have discovered, the basis of the lawsuit." *Barrett v. United States*, 689 F.2d 324, 327 (2d Cir. 1982).

Here, Ilyasah Shabazz, individually and on behalf of the estate of Malcolm X, filed administrative claims pursuant to 28 U.S.C. §§ 2401(b) and 2672 with the DOJ, FBI, and CIA in February, 2023. Compl. ¶ 21. The remaining Plaintiffs filed administrative claims with the same agencies in March and April, 2023. Compl. ¶¶ 22-29. This case was filed on November 15, 2024. The Government argues that all of Plaintiffs' FTCA claims are time-barred because they accrued "decades ago given the amount of publicly available information regarding Malcolm X's assassination." Fed Gov't Mem. at 7. They also argue that, at the very least, Plaintiffs learned of the critical facts concerning their injury in February 2020, upon the release of the "Who Killed Malcolm X?" Netflix documentary series. *Id.* That series suggested that Mr. Aziz and Mr. Islam were wrongly convicted of Malcolm X's murder and that the FBI had been aware of the true culprits. *See Greene Johnson v. United States*, 759 F. Supp. 3d 425, 436 (S.D.N.Y. 2024). The Government also points out that a significant amount of information relevant to Plaintiffs' claims has been in the public domain since December 6, 2010, when the Government published records concerning Malcolm X to its FOIA Library. Fed Gov't Mem. at 9.

Plaintiffs respond that the Government's fraudulent concealment of information about their claims should entitle them to equitable tolling, and that their claims are premised on information that was newly disclosed on November 18, 2021, when DANY moved to vacate Mr. Aziz and Mr.

Islam's convictions for the assassination. Pls' Mem. at 15. The Court considers these points in turn.

**A. Tolling**

"[F]raudulent concealment of the existence of a cause of action tolls the running of the statute of limitations." *Stone v. Williams*, 970 F.2d 1043, 1048 (2d Cir. 1992). However, such tolling "lasts only so long as the fraud is effective" and "does not lessen a plaintiff's duty of diligence." *Id.* at 1048-49. A cause of action accrues when a plaintiff actually or through reasonable diligence could have discovered the basis of a lawsuit. *Barrett*, 689 F.2d at 327. For a claim to accrue, it is not necessarily sufficient that a plaintiff was aware of the harm, or of the element of a claim; rather, the plaintiff must know or have been able to discover the existence of a viable entitlement to relief. *Id.* at 328-29 (claim did not accrue for purposes of tolling at the time of the harm when plaintiff lacked critical facts about causation and the identity of the tortfeasor due to government concealment); *see also Stone*, 970 F.2d at 1049 (holding that a plaintiff's cause of action did not accrue when she learned of potential fraudulent concealment, but rather when she learned of economic damages that potentially stemmed from the concealment).

"Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Mottahedeh v. United States*, 794 F.3d 347, 352 (2d Cir. 2015). "The term 'extraordinary' refers not to the uniqueness of a party's circumstances, but rather to the severity of the obstacle impeding compliance with a limitations period." *Harper v. Ercole*, 648 F.3d 132, 137 (2d Cir. 2011). "To secure equitable tolling, it is not enough for a party to show that he experienced extraordinary circumstances. He must further demonstrate that those circumstances caused him to miss the original filing deadline." *Id.*

Plaintiffs have extensively pled that the Federal and City Defendants concealed evidence about the assassination, including the role of FBI and BOSSI informants in the subsequent investigation into Malcolm X's murder. And they compare this case to *Liuzzo v. United States*. 485 F. Supp. 1274 (E.D. Mich. 1980). In *Liuzzo*, the children of a civil rights activist murdered by the Ku Klux Klan after the 1965 Selma to Montgomery March were permitted to bring claims under the FTCA against the federal government long after the statute of limitations had run. *Id.* at 1282-83. During the trial of the Ku Klux Klan members, an individual later revealed to be an FBI informant testified that he was a mere witness to the murder. *Id.* at 1282. However, he publicly testified years later about his participation in violence as part of his role as an informant. *Id.* at 1283. The court determined that "plaintiffs had no reason to commence an investigation into governmental complicity in their mother's murder until [that testimony]." *Id.* Applying the doctrine of equitable tolling to their FTCA claims, the Court reasoned that

> [u]nder the circumstances of this case, it would be both unfair and unrealistic to hold that plaintiffs should have investigated their claims earlier for they had no cause to do so. This case thus presents an instance in which knowledge of the identity of the tortfeasor is a critical element to the accrual of a claim. Until 1975, plaintiffs had no knowledge sufficient to put them on notice that the defendant or its agents may have caused their mother's death.

*Id.*

The facts in *Liuzzo* that led to equitable tolling, however, are not analogous to those here—at least with respect to any claims arising directly from Defendants' role in Malcolm X's assassination (as opposed to claims arising from later actions), as the factual predicates for such claims have long been available to Plaintiffs, and certainly prior to the 2021 exonerations of Mr. Aziz and Mr. Islam. Like the informant testimony in *Liuzzo* that caused the claim to accrue, here, there was testimony from a BOSSI agent in 1970 about his role as an informant assigned to surveil

Malcolm X and who closely observed the murder.[8] As Plaintiffs acknowledge in the Complaint, the information about Defendant Roberts' involvement as a BOSSI agent in infiltrating Malcolm X's security team and his testimony about suspicions regarding threats to Malcolm X's life were made public during his testimony in 1970. Compl. ¶ 260. Further, in their Complaint, Plaintiffs cite FBI disclosures available since 2010 illustrate the agency's involvement in disrupting Malcolm X's relationships with the Nation of Islam, and its animosity toward Malcolm X and his work. These include a memorandum detailing the agency's role in driving a rift between Malcolm X and Elijah Muhammad, *see* Compl. ¶ 146, Fed Gov't Mem. at 9; a memorandum featuring a statement that the actual killers were "imported to N.Y.C.," *see* Compl. ¶ 216, Gov't Mem. at 10; and a memorandum including a statement that "Washington and the C.I.A. . . . wanted Malcolm out of the way," *see* Compl. ¶ 215, Fed Gov't Mem. at 10.[9]

Given these facts, equitable tolling is not justified for any claims premised on Defendants' role in the assassination itself, and those claims are time-barred. However, insofar as Plaintiffs have premised claims on factual predicates first disclosed in 2021 or later, including as part of DANY's exoneration of Mr. Aziz and Mr. Islam, they may still be entitled to tolling on the statute of limitations period. With that general ruling in mind, the Court now turns to the specific claims alleged against the Federal Defendants.

---

[8] In the Complaint, Plaintiffs also reference affidavits made in 2023 and 2024 that detail witness information about NYPD BOSSI involvement in undermining Malcolm X's security detail and NYPD presence at the Audubon Ballroom on the day of the assassination. Compl. ¶¶ 313-28. However, this information supplements existing disclosures about the involvement of NYPD and BOSSI in the assassination and is insufficient to justify equitable tolling.

[9] The Court takes judicial notice of these extrinsic documents because Plaintiffs expressly reference them in the Complaint. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

### B. Application to Plaintiffs' Claims[10]

Plaintiffs assert twelve state law claims against the United States under the FTCA: (1) fraudulent concealment, (2) wrongful death, (3) negligence, (4) gross negligence, (5) failure to warn, (6) failure to protect, (7) intentional infliction of emotional distress, (8) right to privacy, (9) conspiracy, (10) conscious pain and suffering, (11) negligent hiring, retention, and supervision of agents and employees, and (12) negligence per se. They also assert a state law claim of fraudulent concealment against Individual Federal Defendants. The Court considers each of these claims below.

#### 1. Wrongful Death and Failure to Protect

Plaintiffs expressly premise their claims of wrongful death and failure to protect on Defendants' wrongful acts and omissions in connection with the assassination. *See* Pls' Mem. at 40; Compl. ¶¶ 348-54. For the reasons discussed above, these claims are time-barred by the statute of limitations because Plaintiffs knew or through reasonable diligence could have ascertained the involvement of the Federal Government in the assassination through information available prior to 2021, because testimony by a BOSSI informant and FBI disclosures had already revealed the NYPD and FBI's targeting of Malcolm X. *Contrast Kronisch v. United States*, 150 F.3d 112, 122 (2d Cir. 1998) ("[E]ven if plaintiff's awareness of his injury and its cause prior to December 1979 could only be characterized as a mere 'hunch' or 'suspicion,' plaintiff would still have been under a duty to diligently investigate his claim. However, after his initial inquiries in 1977 and the early part of 1978, plaintiff took no further steps whatsoever to pursue his claim until April 1981 . . .") *with Barrett*, 689 F.2d at 329 ("[T]he evidence indicates that some critical facts, such as the identity

---

[10] For purposes of adjudicating the Federal Government's motion to dismiss, the Court considers only Plaintiffs' claims brought against the Federal Defendants.

of the tortfeasor and the purpose for administering the drug [that caused the harm], would not have been revealed no matter how diligently the estate had pursued its [prior] case."). Accordingly, these claims are barred by the statute of limitations and must be **DISMISSED WITH PREJUDICE**.

### 2. Intentional Infliction of Emotional Distress

Likewise, Plaintiffs premise their claim of IIED on the assassination. Pls' Mem. at 34 ("Here, Plaintiffs allege several of this nation's highest law enforcement branches, in coordination, facilitated the assassination of an American citizen, depriving Malcolm X of his life, and his children of their father, and intentionally concealed their participation in the assassination."). "Under New York law, a claim for intentional infliction of emotional distress requires a showing of (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress." *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999). Although Plaintiffs reference the intentional concealment of Defendants' participation in the assassination, they do not attempt to articulate how the concealment, independent of the assassination, occurred with the intent to cause or reckless disregard of a substantial probability of causing severe emotional distress. *See* Pls' Mem. at 36 ("The Government's attempted distinction boils down to the emotional distress caused by wrongful imprisonment versus that caused by wrongful death and fraudulent concealment. To the extent that there is a meaningful difference between these two fates, death is indisputably more severe."). Accordingly, because Plaintiffs have pled their claim of IIED as predicated on the assassination, it is **DISMISSED WITH PREJUDICE** as time barred.

### 3. Fraudulent Concealment

Plaintiffs premise their claim of fraudulent concealment on the Defendants' "continuing cover-up." Pls' Mem. at 3. This includes the allegations that Defendants "falsefully prosecut[ed]

and imprison[ed] Aziz and Islam, knowing of their innocence." *Id.* at 38. The 2021 disclosures about the FBI and NYPD's wrongful conduct in investigating and prosecuting the assassination that occurred due to DANY's exoneration of Mr. Aziz and Mr. Islam provide a novel factual predicate for the claim of fraudulent concealment. Compl. ¶ 301. Insofar as Plaintiffs' claim of fraudulent concealment relies on allegations arising from this information, their claim accrued at the time of the novel disclosures, and therefore is not time barred. *Barrett*, 689 F.2d at 327.

**4. Other Claims**

Plaintiffs assert a variety of other claims, including failure to warn, conscious pain and suffering, right to privacy, state law conspiracy, negligence, gross negligence, negligent hiring, retention, and supervision of agents and employees, and negligence per se. Because these claims are alleged in conclusory fashion, it is difficult for the Court to assess whether these claims are time-barred. But as explained below, the conclusory nature of Plaintiffs' allegations with respect to these claims merits their dismissal for other reasons.

* * *

In holding that several of Plaintiffs' claims are barred by the statute of limitations, this Court does not purport to opine on their merits. Taking the allegations in the Complaint as true, Plaintiffs have alleged a widespread pattern of wrongful government conduct aimed to suppress the activism of Malcolm X and other civil rights leaders. While one could, with some justification, express the view that the pursuit of such claims would serve an important truth-seeking function, statutes of limitations exist in part because such an enterprise can be a hazardous endeavor when dealing with events that happened many years ago. "[A]lthough affording plaintiffs what the legislature deems a reasonable time to present their claims, [statutes of limitations] protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading

memories, disappearance of documents, or otherwise." *United States v. Kubrick*, 444 U.S. 111, 117 (1979); *see also Bell v. City of Milwaukee*, 746 F.2d 1205, 1231 (7th Cir. 1984) ("[O]ne of the primary policies behind statutes of limitations—to preclude litigation involving lost evidence or distorted testimony of witnesses whose memories have faded—is not jeopardized by allowing this action. Although McCauley, Woelfel, and Glaser, all potential witnesses as well as defendants, are deceased, extensive testimony was heard from Krause, Hughes, Johnson, Shaffer, Vorpagel, Grady, members of the Bell family, and other competent witnesses during an extensive ten-week trial").

In any event, these policy considerations play no role in the Court's determination that Plaintiff's claims for wrongful death, failure to protect, and intentional infliction of emotional distress are time-barred, and thus are dismissed with prejudice.

## III. Plaintiffs' Remaining Claims against the Federal Defendants[11]

### A. Defendant Arthur Fulton

Plaintiffs sue Arthur Fulton in his individual capacity. Beyond naming and identifying the claims against him, Compl. ¶ 46, the Complaint dedicates only one paragraph to allegations against Fulton, specifically:

> "In or around 2020, Former FBI agent Defendant Arthur Fulton admitted that he was in charge of nine FBI informants in the Audubon Ballroom when the shooting started. Not one interceded to halt the events that unfolded, and, thanks to the continued concealment by Fulton, his FBI superiors, including Defendants Hoover and Sullivan, the identities, activities, and information supplied remain unknown."

Compl. ¶ 290.[12]

---

[11] As noted, the Court does not at this time consider remaining claims against City Defendants, including Plaintiffs' *Monell* claim against the City of New York.

[12] Plaintiffs do not further elaborate on their theory of individual liability against Fulton in their opposition brief. *See* Pls. Mem. at 26-30, 36-38.

Plaintiffs construe only their claims of conspiracy, *id.* ¶¶ 73-77; 363-78, and fraudulent concealment, *id.* ¶¶ 391-99, as against Individual Federal Defendants. Even assuming, arguendo, that these claims are not barred by applicable statutes of limitations, the allegations in the Complaint are insufficient to state either claim against Fulton.

"To state a cause of action under § 1985(3), a plaintiff must allege (1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States." *Traggis v. St. Barbara's Greek Orthodox Church*, 851 F.2d 584, 586-87 (2d Cir. 1988). This includes a showing of "some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110-11 (2d Cir. 2003) (internal quotation marks omitted). The Complaint does not contain any particularized factual allegations about Fulton's participation in a conspiracy. Accordingly, the claim of conspiracy against him must be **DISMISSED**.

To state a claim for fraudulent concealment, a Plaintiff must allege "(1) failure to discharge a duty to disclose, (2) an intention to defraud, or scienter, (3) reliance; and (4) damages." *TVT Recs. v. Island Def Jam Music Grp.*, 412 F.3d 82, 90-91 (2d Cir. 2005) (citing *Brass v. Am. Film Tech., Inc.*, 987 F.2d 142, 152 (2d Cir. 1993)). Plaintiffs' only allegation about Fulton's role is his supervision of FBI informants in the Audubon ballroom during Malcolm X's assassination. Compl. ¶ 290. The Complaint does not assert, for example, that Fulton owed a duty to disclose information, or held the requisite intent to defraud the Plaintiffs. Accordingly, the claim of fraudulent concealment against Fulton must be **DISMISSED**.

### B. Fraudulent Concealment under the FTCA

The Court considers the same elements in assessing Plaintiffs' claim of fraudulent concealment against the Federal Government. *TVT Recs.*, 412 F.3d at 90-91. The Government argues that Plaintiffs have not alleged a duty to disclose or reliance. Fed Gov't Mem. at 26-27. Plaintiffs respond that the Government had a duty to disclose arising from its superior knowledge about the true circumstances of Malcolm X's assassination. Pls' Mem. at 37.

The cases Plaintiffs cite for the proposition that superior knowledge confers a duty to disclose are not applicable to this case, because all involve material omissions from commercial transactions. *Stevenson Equip., Inc. v. Chemig Construction Corp.*, 170 A.D.2d 769 (N.Y. App. Div. 1991) (defendant failed to disclose that product sold to plaintiff had been reported stolen); *P.T. Bank Cent. Asia v. ABN AMRO Bank N.V.*, 754 N.Y.S.2d 245 (App. Div. 2003) (one party to transaction possessed superior knowledge that appraisal was overstated); *Swersky v. Dreyer & Traub*, 643 N.Y.S.2d 33 (App. Div. 1996) (party to transaction failed to disclose stock option purchase).

In any case, Plaintiffs do not address the argument that they have insufficiently pled reliance on Defendants' statements for purposes of a fraudulent concealment claim. And the Complaint contains no allegations to that point. Accordingly, Plaintiffs' FTCA claim of fraudulent concealment must be **DISMISSED**.

### C. Other Remaining Claims

Plaintiffs assert claims of failure to warn, conscious pain and suffering, right to privacy, and state law conspiracy. But nowhere in the Complaint, nor in their brief, do they articulate in non-conclusory fashion the elements of those claims. Similarly, Plaintiffs bring claims of negligence, gross negligence, negligent hiring, retention, and supervision of agents and employees, and negligence per se. But nowhere in the Complaint do Plaintiffs articulate in a non-conclusory

fashion how Defendants' acts or omissions fulfill the elements of those claims. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Accordingly, those claims must be **DISMISSED**.

## CONCLUSION

For the foregoing reasons, the Federal Defendants' Motion to Dismiss is **GRANTED**. The parties are directed to file a joint status letter within (14) days of the date of this Order proposing next steps in this litigation. The letter shall address (1) whether Plaintiffs intend to file an Amended Complaint seeking re-plead any claims dismissed without prejudice; (2) if so, whether Defendants will seek to move to dismiss; (3) whether the City Defendants intend to independently brief a motion to dismiss; (4) a proposed schedule for any of the above; and (5) any other matters that the parties wish to address.

The Clerk of Court is respectfully requested to terminate ECF No. 117.

SO ORDERED.

Dated: August 19, 2026

New York, New York

DALE E. HO
United States District Judge